RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0228p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER GOINS,

*Defendant-Appellant.*

> No. 23-5848

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:22-cr-00091-1—Gregory F. Van Tatenhove, District Judge.

Argued:  March 21, 2024

Decided and Filed:  October 8, 2024

Before:  GIBBONS, BUSH, and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Robert L. Abell, ROBERT ABELL LAW, Lexington, Kentucky, for Appellant. Mahogane D. Reed, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:**  Robert L. Abell, ROBERT ABELL LAW, Lexington, Kentucky, for Appellant.  Mahogane D. Reed, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Emily K. Greenfield, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

    GIBBONS, J., delivered the opinion of the court in which MURPHY, J., joined in full, and BUSH, J., joined in part and in the judgment.  BUSH, J. (pp. 15–18), delivered a separate concurring opinion.

---

**OPINION**

---

JULIA SMITH GIBBONS, Circuit Judge. Christopher Goins challenges the constitutionality of 18 U.S.C. § 922(g)(1) following the Supreme Court's decision in *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), as applied to himself. Section 922(g)(1) declares it unlawful for any person "who has been convicted in any court of . . . a crime punishable by imprisonment for a term exceeding one year" to ship, transport, possess, or receive firearms or ammunition via interstate or foreign commerce. 18 U.S.C § 922(g)(1). The law thus prohibits firearm ownership by felons, unless such individuals receive expungement, a pardon, or other post-conviction relief. *See id.* § 921(a)(20). Goins raises an as-applied challenge, arguing under *Bruen* that this Nation's historical tradition of firearm regulation does not support prohibiting felons like him from possessing firearms, and thus the Second Amendment renders § 922(g)(1) unconstitutional as applied to him. We consider this issue de novo and hold that § 922(g)(1) is constitutional as applied to Goins.

I.

On December 4, 2021, Christopher Goins visited a pawn shop in Lexington, Kentucky and handled two AR-style pistols. The next day, Goins returned to the pawn shop with an associate, whom Goins asked to purchase one of the AR pistols for him. The associate purchased the firearm and indicated on the Alcohol, Tobacco, Firearms and Explosives (ATF) form that he was the actual buyer and that he was not acquiring the firearm on behalf of another person. After the purchase, the associate gave Goins the firearm in the parking lot of the pawn shop. Surveillance footage captured this exchange, and the pawn shop alerted the ATF. Goins admitted to an ATF investigator that he knew he could not pass a background check, so he had asked his associate to purchase the pistol for him. Goins surrendered the pistol to the ATF about a week after the purchase.

At the time Goins possessed the firearm, he had multiple convictions for crimes punishable by imprisonment for more than one year. In 2019, Goins was convicted in Kentucky

state court of (1) a fourth offense for operating a motor vehicle under the influence of alcohol/drugs, (2) driving under the influence on a suspended license, and (3) possession of a controlled substance.**[1]** While the Kentucky circuit court initially sentenced Goins to one year of jail time for each of the three offenses, the court withheld the sentence of imprisonment and instead sentenced Goins to 120 days of imprisonment and four years of probation. Critical here, one of the conditions of Goins's probation was that he was not to possess a firearm or weapon of any type except for a pocketknife. Goins was on probation at the time he possessed the pistol in December 2021.

Goins's 2019 felony convictions were not his first convictions in Kentucky. In 2011, Goins received his first conviction for operating a motor vehicle under the influence of alcohol/drugs. The next year, Goins was charged with a second offense of operating a motor vehicle under the influence of alcohol/drugs, but this was reduced to a traffic offense. Approximately one month later, in a separate incident, Goins obtained his second conviction for operating a motor vehicle under the influence of alcohol/drugs. This conviction arose from a motor vehicle accident with another motorist, where Goins was transported to the hospital for injuries. About half a year later, in 2013, Goins was convicted of public intoxication. A few months later, also in 2013, Goins received another conviction for public intoxication and a conviction for third-degree criminal mischief, stemming from an incident in which he broke the glass door of a home and entered that home. Not long after that, still in 2013, Goins was convicted of driving on a suspended license. The next year, in 2014, he was convicted of receiving stolen property valued at less than $500. A few years later, in 2017, Goins received his third conviction for operating a motor vehicle under the influence of alcohol/drugs. Finally, in late 2018, approximately two months before the instant felony convictions, Goins was convicted of operating a vehicle on a suspended/revoked license, driving with no/expired registration plates, and failing to produce an insurance card.

Following his surrender of the firearm in December 2021, a grand jury indicted Goins for possessing a firearm while having been convicted of a crime punishable by imprisonment greater

---

**[1]**Each of these offenses is punishable by a term of imprisonment exceeding one year. *See* KY. REV. STAT. ANN. §§ 189A.010(5)(d), 218A.1412, 532.060(2)(c)–(d).

than one year in violation of 18 U.S.C. § 922(g)(1). Goins moved to dismiss the indictment, arguing that *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen*, 597 U.S. 1, rendered § 922(g)(1) unconstitutional as applied to him. The district court denied the motion to dismiss, holding § 922(g)(1)'s application to Goins was constitutional under *Bruen*. Goins pled guilty but reserved his right to challenge the district court's decision on appeal. This appeal followed.

## II.

We review the denial of a motion challenging the constitutionality of a federal statute de novo. *United States v. Loney*, 331 F.3d 516, 524 (6th Cir. 2003).

## III.

Because Goins raises solely an as-applied challenge, we consider whether the Second Amendment permitted Congress to disarm Goins at the time of his § 922(g)(1) offense given his very specific facts. We hold that Congress could so disarm Goins. Three aspects of Goins's case, taken together, compel this conclusion: First, Goins was in violation of the state probation[2] condition that prohibited him from possessing a firearm at the time he did so; second, Goins was under a relatively short probation sentence for a dangerous crime; and third, his repeated actions demonstrated a likelihood of future dangerous conduct. Given these aspects of Goins's case taken together, we hold that Congress could deprive Goins of his Second Amendment right to possess a firearm at the time of his § 922(g)(1) offense.

## A.

Recently, this court upheld the constitutionality of § 922(g)(1) both facially and as applied to the specific defendant in that case. *See generally United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). First, following a textual inquiry of the Bill of Rights, *Williams* established

---

[2]Goins contends that the government forfeited any arguments for disarmament based on probation because it failed to raise the issue in its briefs. However, Goins's probation goes straight to his dangerousness with respect to his applied challenge. *See generally Williams*, 113 F.4th at 660 ("Courts may consider any evidence of past convictions in the record, as well as other judicially noticeable information—such as prior convictions—when assessing a defendant's dangerousness."). Because the Government *did* argue this nation's historical tradition supports disarming dangerous individuals reliance on Goins's probation to establish dangerousness was not waived.

that felons are among "the people" protected by the Second Amendment.**³** *See id.* at 649–50. Then, following the test that *Bruen* articulates, *Williams* surveyed the historical landscape and concluded that "governments in England and colonial America long disarmed groups that they deemed to be dangerous." *Id.* at 657. Given this historical record, *Williams* held that "our nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous," and so "most applications of § 922(g)(1) are constitutional." *Id.* Applying that standard to Williams's as-applied challenge, the panel concluded that the defendant's disarmament was constitutional in light of his extensive criminal record, which included two counts of aggravated robbery, one count of attempted murder, and another count of possessing a firearm as a felon. *Id.* at 662.

Even so, after *Williams*, defendants may continue to argue an individualized exception to application of § 922(g)(1). *Id.* at 657 (acknowledging that § 922(g)(1) "might be susceptible to as-applied challenges in certain cases"). But here, Goins cannot carry his burden. This nation's historical tradition demonstrates that Congress may lawfully disarm probationers like Goins, who (1) are under a firearm possession limitation as a condition of probation, (2) are under a relatively short probation sentence for a dangerous crime, and (3) whose repeated and recent actions show a likelihood of future dangerous conduct.

## B.

Because *Williams* thoroughly canvasses the historical tradition of legislatures disarming categories of persons that they deemed presumptively dangerous, we will not belabor the point here. It is important to highlight, though, the firearm forfeiture aspect of this historical record. In other words, because *Williams* thoroughly canvasses the "why," we emphasize here the "how." *See Bruen*, 597 U.S. at 29. The historical record demonstrates a longstanding and

---

**³**We follow the same analysis as laid out in *Williams* to determine whether probationers are among "the people" protected by the Second Amendment. *See Williams*, 113 F.4th 649–50. There is no textual basis to distinguish probationers from other felons, or from any member of the political community. *See id.* at 649 ("Nothing in the Second Amendment's text draws a distinction among the political community between felons and non-felons—or, for that matter, any distinction at all."). But because the parties did not brief or argue this issue, we assume without deciding that Goins, while on Kentucky state probation, is among "the people."

specific tradition of temporarily *disarming* persons who had engaged in dangerous conduct as a consequence of that dangerous conduct.

For example, we look to the "going armed" laws referenced by *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889, 1900–01 (2024). The 1328 Statute of Northampton, the "grandfather" of colonial going armed laws, demanded "bring[ing] no force in affray of the peace" and forbid "rid[ing] armed by night nor by day" or "com[ing] before the King's Ministers doing their office, with force and arms." 2 Edw. 3, 320, ch. 3 (1328). Punishment for such conduct included "forfeit[ing] their Armour to the King" as well as being imprisoned. *Id.*; *see also Williams*, 113 F.4th at 650 (citing 5 William Blackstone, *Commentaries on the Laws of England* 149 (St. George Tucker ed. 1803) (1767)); 4 William Blackstone, *Commentaries on the Laws of England* 148–49 (1769) ("The offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton . . . upon pain of forfeiture of the arms, and imprisonment during the king's pleasure"); 1 Henry J. Stephen, *Summary of the Criminal Law* 48 (1840) (explaining that "[r]iding or going armed with dangerous or unusual Weapons" via the Statute of Northampton, is "punishable with forfeiture of the arms and imprisonment during the king's pleasure"). The colonial copies of the Statute of Northampton similarly imposed arms forfeiture as the punishment for "go[ing] armed offensively." *See, e.g.*, 1692 Mass. Acts and Laws no. 6 (punishing "all Affrayers, Rioters, Disturbers, or Breakers of the Peace" and those who "shall ride or go armed Offensively" by "seiz[ing] and tak[ing] away his Armour or Weapons"); 1695 N.H. Acts and Laws at 1–2 (Daniel Fowle ed. 1761) (empowering justices of the pace to arrest "all affrayers, rioters, disturbers or breakers of the peace, or any other who shall go armed offensively" and to "cause the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use"); 1786 Va. Acts ch. 49 (prohibiting coming before ministers of justice "with force and arms" and "go[ing]" or "rid[ing] armed . . . in terror of the county," upon pain of "forfeit[ing]" one's "armour to the Commonwealth"). State justice of the peace manuals confirmed the authority of justices of the peace to seize the arms of such affrayers, which has "always been an offen[s]e at the common law." Richard Burn, *An Abridgement of Burn's Justice of the Peace and Parish Officer* 12–13 (Joseph Greenleaf ed. 1773) (Mass.); *see* James Davis, *The Office and Authority of*

*a Justice of the Peace* 5 (1774) (N.C.) (permitting justices of the peace to "take away [the] Weapons" of affrayers); 1 William Waller Hening, *The New Virginia Justice*: *Comprising the Office and Authority of a Justice of the Peace, in the Commonwealth of Virginia* 18 (1795) (Va.) (allowing justices of the peace or others empowered to execute the affray act to "seize the arms" of "any person in arms contrary to the form of the statute" and "commit [such] offender to prison"); Richard Burn, *Burn's Abridgement, or the American Justice* 22–24 (Eliphalet Ladd ed., 2d ed. 1792) (N.H.) (justices of the peace and others empowered to execute the statute may "seize the arms and commit the offender to prison"); James Parker, *Conductor Generalis* 11–12 (1764) (N.J.) (same); *see also* 1 Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822) ("Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land, which is punishable by forfeiture of the arms, and fine and imprisonment.").

Similarly, Revolutionary-era laws that "provide[d] for internal security" focused on the disarmament of loyalists and disaffected persons. *See* Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION 141 (Joseph Blocher, Jacob D. Charles, and Darrell A.H. Miller eds., 2023) (quotation omitted). In 1776, the Continental Congress recommended to the colonies "immediately to cause all persons to be disarmed . . . who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies, against the hostile attempts of the British fleets and armies." 4 Journals of the Continental Congress, 1774–1789, at 205 (Worthington Chauncey Ford ed., 1906). Several of the colonies followed suit. Massachusetts in 1776 enacted a law disarming those disaffected to the cause of America, specifically those "who shall neglect or refuse to subscribe a printed or written declaration" of loyalty, except Quakers, and appropriating these disaffected persons' arms. 1775–1776 Mass. Acts ch. 7. Pennsylvania in 1776 enacted an ordinance permitting the disarming of "non-associators." 1776 Statutes at Large of Pennsylvania ch. 729. In May 1777, Virginia required the "free male inhabitants of this state above a certain age to give assurance of Allegiance" to the colony and permitted the militia to disarm any person who failed to give that oath or affirmation. 9 William Waller Hening, *The Statutes at Large; Being a Collection of all the Laws of Virginia* 281–82 (1821) ("And the justices tendering such oath or affirmation are

hereby directed to deliver a list of the names of such recusants to the county lieutenant, or chief commanding officer of the militia, who is hereby authorised and directed forthwith to cause such recusants to be disarmed."). Notably, the statute allowed for the prospective restoration of rights upon taking the oath. *Id.* North Carolina, also in 1777, required all free male inhabitants above the age of 16 to give an oath of allegiance; those who refused to take the oath of allegiance were not only stripped of all citizenship rights but were also barred from "keep[ing] Guns or other Arms within his or their house." 24 The State Records of North Carolina 89 (Walter Clark ed., 1905). That same year, 1777, New Jersey directed its Council of Safety "to deprive and take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements, and Ammunition which they own or possess." 1777 N.J. Laws ch. 40 § 20.

Pennsylvania continued its emphasis on disarmament of disaffected persons throughout this period. In 1777, Pennsylvania enacted a law requiring "all male white inhabitants" of the state above the age of 18, except for those in a few specific counties, to take an oath of loyalty. 1777 Pa. Laws ch. 21 §§ 2, 4.[4] Those who refused to take the oath were disarmed and forfeited several other rights, including holding office, serving on a jury, suing for any debts, electing or being elected, and buying or transferring lands. *Id.* The next year, 1778, Pennsylvania enacted another law reaffirming the requirement to take the oath of loyalty, broadening the penalties of failing to take the oath and again affirming that failure to take the oath guaranteed disarmament and barred "carry[ing] any arms about his person or keep[ing] any arms or ammunition in his house or elsewhere." 1778 Pa. Laws ch. 61 §§ 1–3, 5, 10. Finally, in 1779, Pennsylvania explicitly acknowledged through statute that "it is very improper and dangerous that persons disaffected to the liberty and independence of this state shall possess or have in their own keeping, or elsewhere, any fire arms," and thus empowered officers of the state "to disarm any person or persons who shall not have taken any oath or affirmation of allegiance to this or any other state." 1779 Pa. Laws ch. 101 §§ 4–5.

---

[4]This statute is "especially illuminating," considering that in 1776 Pennsylvania's constitution protected the people's right to bear arms. *Range v. Attorney General*, 69 F.4th 96, 125 (3d Cir. 2023) (en banc) (Krause, J., dissenting).

The focus on disarmament specifically as a response to dangerousness continued throughout the founding period. For example, in response to Shays's Rebellion, Massachusetts required in 1787 that any person who had participated in the rebellion to "deliver up their arms" and "to take and subscribe the oath of allegiance." 1787 Mass. Acts ch. 6. Those who delivered up their arms, took the oath of allegiance, and kept the peace for three years were entitled to the return of their arms at the end of that period. *Id.* And going armed laws, with forfeiture of the arms as punishment, spread west. *See, e.g.* 1801 Ky. Rev. Stat. ch. 375 § 33.

Like the going armed laws above, other dangerous misconduct involving firearms often led to the forfeiture of such firearms. For example, it was not uncommon in the colonial and founding-period for a violation of a hunting-related law to result in the forfeiture of the gun. *See, e.g.*, E.B. O'Callaghan, *Laws and Ordinances of New Netherland 1638–1674* 138 (1808) (1652 ordinance forbidding persons from firing guns within the jurisdiction of the city New Amsterdam "on pain of forfeiting the gun and a fine at the discretion of the Judge"); 1768 N.C. Laws ch. 13 (persons without landholding are "prohibited from hunting, under the penalty of . . . forfeiture of his gun"). Similarly, firing guns within city limits or near roads could result in forfeiture of the firearm. *See, e.g.*, 1713 Mass. Province Laws ch. 6 (empowering freeholder citizens to "arrest and take into custody any gun" fired upon Boston Neck within "ten rods" of the road or highway); 1746 Mass. Acts ch. 10 (declaring it lawful for any person to "seize and take into custody any Gun" fired off within the town of Boston).

The above historical tradition, taken together, demonstrates temporary disarmament as a permissible corollary of dangerous conduct. Going armed to terrify the people resulted in seizure of the arms. Refusing to take an oath of allegiance to the new republic meant forfeiture of one's arms, although the right to carry arms could be restored upon swearing allegiance. And following Shays's Rebellion, participation in the rebellion meant the deprivation of one's arms, although this lasted only three years if the offender kept the peace during that time. This historical tradition supports the temporary disarmament of Goins during his four-year period of probation as a result of his dangerous conduct. Goins engaged in conduct that endangered the Kentucky public when he drove under the influence. It is within this nation's historical tradition

for Kentucky to temporarily limit his firearm possession as a result of the dangerousness his conduct exhibited.**5** *See Bruen*, 597 U.S. at 17, 34; *Williams*, 113 F.4th at 659–60.

C.

In addition to disarming the dangerous, our nation's historical tradition of forfeiture laws, which temporarily disarmed convicts while they completed their sentences, also supports disarming those on parole, probation, or supervised release. *United States v. Moore*, 111 F.4th 266, 269–72 (3d Cir. 2024). The same logic reaches those like Goins on probation. For example, Pennsylvania in 1790 decreed that "every person convicted of robbery, burglary, sodomy or buggery, or as accessory hereto before the fact, shall forfeit to the commonwealth all . . . the lands and tenements, goods and chattels, whereof he or she was seized or possessed at the time the crime was committed" and "be sentenced to undergo a servitude of any term or time . . . not exceeding ten years." 1790 Pa. Acts ch. 565, § 2. As *Moore* explains, the purpose of the Pennsylvania law was "to reform" and "to deter," which aligns with the factors considered in imposing supervised release. *See Moore*, 111 F.4th at 270 (citing 18 U.S.C. § 3583(c)). Indeed, forfeiture of the estate, goods, or chattels upon conviction was common during the founding era. Beth A. Colgan, *Reviving the Excessive Finds Clause*, 102 Cal. L. Rev. 277, 332 nn. 275–76 (2014); *see also* 1715 Md. Laws ch.11 (punishing "willful[] or corrupt[]" embezzlement, impairment, or alteration of wills or records with "forfeit[ure] [of] all his goods and chattels, land and tenements"); 1717 Md. Laws ch. 8 (punishing counterfeiting the government seal with "forfeit[ure] . . . [of] all his goods and chattels, lands and tenements, whereof such offender shall be possessed at the time of committing the same offence"); 1777 Mass. Acts ch. 32 (punishing treason to the state with forfeiture "to the Use of this State, all Goods and Chattles which he shall

---

**5**The concurrence argues that "the evidence suggests our nation's history and tradition do not support permanent disarmament because of prior convictions related to drunkenness or the misuse of drugs when, as here, the earlier illegal conduct did not involve a firearm." Conc. Op. at 15. In so doing, the concurrence erroneously frames its argument contrary to the Supreme Court's recent command in *Rahimi* that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897–98. It is not a question of whether there are historical analogues of governments disarming individuals for purely drug use but rather if there are historical analogues for disarming dangerous individuals. *See also*, *Williams*, 113 F.4th at 657 ("[O]ur nation's history and tradition demonstrates that Congress may disarm individuals they believe are dangerous.). Goins's history of drug use—particularly driving under the influence—is dangerous conduct; ergo his Second Amendment rights may be regulated at least temporarily while he is on probation under *Rahimi* and our recent *Williams* case.

be possessed of at the Time of such Conviction" as well as all lands and tenements); 1786 N.C. Laws ch. 2 (punishing defrauding army accounts with forfeiture of "his or her estate . . . to the use of the public"); 1779 Vt. Laws February Special Session at 93 (one convicted of counterfeiting forfeited "all [his] estate"); 1779 Pa. Laws ch. 134 (punishing counterfeiting paper money or continental loan office certificates with imprisonment and "forfeit[ure] [of] all his or her goods and chattels"); 1779 Pa. Laws ch. 110 (punishing the third offense of violating Philadelphia market regulations with "forfeit[ure] [of] all his goods" and imprisonment); 1786 Mass. Acts ch. 8 (punishing rioting or being in groups "armed with clubs" or "other weapons" with seizure and "forfeit[ure] [of] all their lands, tenements, goods and chattels, to this Commonwealth, as shall be adjudged" by the judge before whom offenders are tried); 1777 Va. Laws ch. 5 (punishing forgery or passing counterfeit with "forfeit[ure] [of] his whole estate, real and personal"). As evidenced by the above, these were not permanent deprivations of rights—one could repurchase land, tenements, goods, or chattels upon completion of the sentence.

### D.

The analysis in *United States v. Gore*, No. 23-3640, controlling precedent in this circuit, also supports the temporary disarmament of those on probation, parole, or supervised release. *Gore* dealt with a challenge to the constitutionality of 18 U.S.C. § 922(n), which makes it unlawful for one under a felony indictment to receive, ship, or transport any firearm in interstate or foreign commerce. *Gore* recognized that many dangerous crimes at the time of the founding led to pretrial incarceration rather than bail. Slip Op. at 8–10. For example, "[s]erious crimes— like treason, murder, burglary, arson, and horse-stealing—put a defendant in the nonbailable category." *Id.* at 8 (citing 1 Joseph Chitty, *Practical Treatise on the Criminal Law* *95–96). Moreover, since all serious crimes at the founding were punishable by death, *see Bucklew v. Precythe*, 587 U.S. 119, 129 (2019), "defendants facing serious charges did not enjoy a right to bail." Slip Op. at 8–9.

*Gore* found that this historical tradition of denying bail for serious crimes supported the constitutionality of § 922(n). Like pretrial incarceration for serious crimes at the founding period, § 922(n) restricts an indicted person's rights "for the purposes of furthering public safety and protecting the integrity of the criminal process." *Id.* at 9. Like pretrial detention in the

founding period, § 922(n) is reserved for serious crimes (felonies) and creates only a temporary burden on the indicted person's rights. *Id.*

This analogy can easily be extended from the pretrial detention context to the context of probation, parole, or supervised release. Unlike those merely indicted for felony offenses, those who are on probation, parole, or supervised release for felony offenses have been convicted of and sentenced for those offenses. After conviction, the state's interest in protecting the public is even higher, especially given high rates of recidivism. *See Samson v. California*, 547 U.S. 843, 853–54 (2006). A temporary deprivation of Goins's Second Amendment right as a part of his probation for his felony offense thus comports with the historical tradition of pretrial incarceration recounted by *Gore*.

E.

Analogy to the Fourth Amendment context further demonstrates the constitutionality of this temporary deprivation of Goins's right to possess a firearm. Goins's probation, like supervised release at the federal level, is "part of the same sentence." *Mont v. United States*, 587 U.S. 514, 524 (2019). "Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender.'" *United States v. Knights*, 534 U.S. 112, 119 (2001) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). As a form of criminal sanction, probation is just "one point . . . on a continuum of possible punishments." *Id.* (quoting *Griffin*, 483 U.S. at 874). This fact gives rise to two related features. First, the condition of a probationer is "different from that of confinement in a prison," meaning that he has at least some Fourth Amendment rights. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972); *Samson*, 547 U.S. at 850 n.2. Second, despite being "released from prison based on an evaluation that he shows reasonable promise" of functioning "as a responsible, self-reliant person," the state may still "properly subject[] him to many restrictions not applicable to other citizens." *Morrissey*, 408 U.S. at 482. "Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *Knights*, 534 U.S. at 119 (quoting *Griffin*, 483 U.S. at 874). As the Supreme Court has made clear, the state may impose "extensive restrictions on the [parolee's] liberty" given that "the [s]tate has found the parolee guilty of a crime against the people." *Morrissey*, 408 U.S. at 483; *see Knights*, 534 U.S. at 119 ("Just as other punishments for criminal

convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.") This is due in part to the base "assumption of the institution of probation" that "the probationer is more likely than the ordinary citizen to violate the law." *Knights* 534 U.S. at 120 (citation omitted). Given the state's interests in "apprehending violators of the criminal law" and "protecting potential victims of criminal enterprise," the state may "justifiably focus on probationers in a way that it does not on the ordinary citizen." *Id.* at 121.

In the Fourth Amendment context, this results in the state's dual interests in preventing crime and protecting the public overpowering the parolee's interest in privacy. For example, in *United States v. Knights*, the Court upheld the warrantless search of a parolee's apartment based on the sheriff's reasonable suspicion. *Id.* at 115, 121. *Samson v. California* then went a step farther, holding that a search of a parolee, predicated solely upon a condition of his probation subjecting him to suspicionless searches at any time, was reasonable under the Fourth Amendment. 547 U.S. at 850, 852. Such a condition, of which the parolee was "unambiguously" aware, vitiated any legitimate expectation of privacy. *Id.* at 852.

States have an "overwhelming interest" in placing restrictions on parolees' liberties, because "parolees are more likely to commit future criminal offenses." *Id.* at 853 (cleaned up). In the Fourth Amendment context, this means that the states' interests "in reducing recidivism and thereby promoting reintegration . . . warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Id.* The same goes for the Second Amendment, another guarantee in the Bill of Rights to "the people." While those on probation, parole, or supervised release may not permanently lose their Second Amendment right, a temporary deprivation that supports the state's interests in reducing recidivism and protecting the public may be appropriate and comport with this nation's tradition of historical firearm regulations. *See id.*; *Knights* 534 U.S. at 121.

F.

While the above historical tradition of disarmament, forfeiture, and pretrial detention may not support disarmament of any criminal defendant under any criminal justice sentence in all

circumstances, it supports Goins's disarmament as a condition of his probation here. When evaluating a defendant's as-applied challenge, we "may consider a defendant's entire criminal record—not just the specific felony underlying his § 922(g)(1) conviction." *Williams*, 113 F.4th at 659–60. This includes prior convictions. *Id.*; *see also id.* at 662 (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 228–39 (1998)). Here, Goins's prior convictions for the same dangerous conduct—driving under the influence—evince a likelihood of future dangerous conduct. In an eight-year period, Goins was charged five times for driving under the influence, and he was convicted of four DUI offences. One of these incidents resulted in a motor vehicle accident where Goins was transported to the hospital. Also, in the same eight-year period, Goins was twice convicted of public intoxication and twice convicted of driving on a suspended license, all separate incidents. Goins's record reveals a dangerous pattern of misuse of alcohol and motor vehicles, often together. His actions, including causing a motor vehicle accident, pose a danger to public safety. Moreover, and most importantly, at the time Goins possessed the firearm in 2021, he was in violation of a condition of his four-year state probation term. As discussed above, disarming Goins temporarily as a condition of his probation, especially given his pattern of dangerous conduct, is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see also United States v. Gay*, 98 F.4th 843, 847 (7th Cir. 2024) (Easterbrook, J.) ("[P]arolees lack the same armament rights as free persons."). Under the totality of the facts here, Congress could lawfully disarm Goins at the time he possessed the firearm.

## IV.

Because Goins cannot carry his burden to show that § 922(g)(1) is unconstitutional as applied to himself, the judgment of the district court is affirmed.

_____

**CONCURRENCE**

_____

JOHN K. BUSH, concurring except for Sections III.A–B, and in the judgment. I agree with the majority that Goins's condition of disarmament while on probation supports the constitutionality of his conviction under 18 U.S.C. § 922(g)(1). Indeed, this probation condition alone should be dispositive that Goins's rights receded under the Second Amendment for the duration of his probation. Limitations on the constitutional right to bear arms while on probation are supported by our nation's historical tradition of firearm forfeiture laws, which temporarily disarmed persons while they completed their sentences. *See generally United States v. Moore*, 111 F.4th 266 (3d Cir. 2024).

I am less confident, however, in the majority's reliance on Goins's prior DUI and drug offenses as additional reasons for upholding his firearm-possession conviction. In fact, the evidence suggests our nation's history and tradition do not support permanent disarmament because of prior convictions related to drunkenness or the misuse of drugs when, as here, the earlier illegal conduct did not involve a firearm.

Historical precedent recently surveyed by the Fifth Circuit is instructive. In *United States v. Connelly*, __ F.4th __, No. 23-50312, 2024 WL 3963874 (5th Cir. Aug 28, 2024), the court held that the Second Amendment barred prosecution of a marijuana user, with no history of violent firearm use, for possessing a firearm under 18 U.S.C. § 922(g)(3). The court found that "our history and tradition may support some limits on a *presently* intoxicated person's right to carry a weapon . . ., but they do not support disarming a sober person based solely on past substance usage." *Id.* at *1.

Here, the majority does not address history and tradition related to firearm prohibitions as applied to alcohol or drug users. Instead, it relies on historical evidence demonstrating that governing officials categorically disarmed groups of people who were dangerous to the public safety, such as disaffected persons and those who participated in insurrections like Shays's Rebellion. Majority Op. at 5–10. Those groups, of course, were deemed dangerous not because

of any misuse of intoxicants.  Rather, disarmament occurred because the government considered them likely to take up arms against the state.  *See Connelly*, 2024 WL 3963874, at \*5 (describing historical examples of "laws barring political dissidents from owning guns in periods of conflict" and "laws that disarmed religious minorities—especially Catholics").  This history and tradition of disarming "dangerous" political groups and religious minorities seems too far afield to provide supporting precedent for disarmament based on substance abuse, at least when, as here, the defendant has no history of violence through firearm misuse.  *See id.* ("[O]ur history and tradition of disarming 'dangerous' persons does not include non-violent marijuana users like [the defendant].").

The only precedent from the Founding era cited by the government in support of disarmament related to alcohol or drug misuse were laws that *temporarily* prohibited gun possession by persons who were presently intoxicated.  *See* Appellee's Br. at 36 & n.20 (discussing *State v. Shelby*, 2 S.W. 468 (Mo. 1886), which upheld a ban on intoxicated persons possessing firearms).  There is no suggestion from the relevant historical record that a person was ever permanently disarmed for criminal offenses related to intoxicant misuse.  So even if the historical examples cited by the government explain why individuals like Goins can be disarmed while in a state of intoxication, they are not relevantly similar with respect to permanent disarmament based on past alcohol- or drug-related convictions, particularly if those prior convictions did not involve firearm misuse.  *See N.Y. St. Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 29 (2022) (explaining that a historical analogue should explain "how and why the regulations burden a law-biding citizen's right to armed self-defense").

History and tradition speak loudly here because the societal problem at issue—alcohol and drug abuse—is nothing new.  Misbehavior from intoxicants seems to have been as prevalent at the Founding as it is now.  *See, e.g.*, *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) ("At the founding, the bearing of arms was subject to regulations . . . on gun use by drunken New Year's Eve revelers."); *Connelly*, 2024 WL 3963874, at \*7 ("[E]arly Americans, including the Founders, consumed copious amounts of alcohol."); *id.* at \*7 n.4 (citing examples of the Founders' alcohol use and citing one historian who noted that "'[i]n the early Republic,' there was 'an extremely high level of alcohol consumption (chiefly, distilled spirits)'").  Also, drugs

were abused then like they are now. *See, e.g.*, Letter from John Marshall to Henry Lee, July 18, 1796, in 3 Papers of John Marshall (C. Cullen ed. 1979), 35 (Marshall informing Lee that Alexander Campbell, a fellow member of the U.S. Supreme Court bar, died from an overdose of the tincture of opium known as laudanum).

Nonetheless, the Founding generation apparently did not consider a person's history of alcohol or drug misuse to be a good enough reason to permanently deprive that person of his right to possess and use a firearm. *See Connelly*, 2024 WL 3963874, at *7 ("[N]either Congress nor the states disarmed alcoholics[.]"); *id.* at *6 ("The government identifies no class of persons at the Founding who were 'dangerous' for reasons comparable to marijuana users."). To the contrary, it seems the Founding generation considered the right to bear arms as too important a right to be limited based simply on a person's prior substance abuse. Guns were needed for self-defense, the provision of food, and the protection of one's community. *See District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). Those needs apparently outweighed any justification to permanently disarm based upon a person's past misuse of intoxicants. Indeed, the right to bear arms was fundamentally important for human freedom. *See McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) ("[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."). This historical understanding seems at odds with the majority's reliance on Goins's DUI and drug convictions as relevant factors to justify his disarmament. Through its emphasis on those convictions, the majority risks engaging in the type of "legislative interest balancing" *Bruen* rejected. *See* 597 U.S. at 26.

But we need not decide what relevance, if any, that Goins's convictions related to alcohol or drugs have on the constitutionality of § 922(g)(1) as applied to him. Instead, his conviction for illegal possession of a firearm may be upheld simply because Goins was on probation at the time of his offense.

"Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.'" *United States v. Knights*, 534 U.S. 112, 119 (2001)

(quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Like other constitutional provisions,[1] the Second Amendment permits temporary limitations on the right it protects for persons serving criminal sentences, like probation. That conclusion is consistent with our nation's historical tradition of firearm regulation. The Third Circuit recognized as much in *Moore*, where the court held that disarming a defendant who possessed a gun while on supervised release is consistent with the history and tradition of firearm forfeiture laws in force during the Founding era. *See* 111 F.4th at 269–73. As *Moore* explained, through forfeiture laws, Founding-era states regularly "temporarily disarmed convicts while they completed their sentences." *Id.* at 269. These laws applied "not only while [the convict] was physically in prison," but also while the convict served out his sentence in a non-custodial setting. *Id.* at 272.

In the same way here, I would hold that the Second Amendment permits temporary disarmament of felons serving sentences of probation. Depriving a probationer of the right to possess firearms is "relevantly similar," *Bruen*, 597 U.S. at 29, to the Founding-era forfeiture regimes, as discussed in *Moore*, "that our tradition is understood to permit," *Rahimi*, 144 S. Ct. at 1898. In both forfeiture and probationary settings, a law may prohibit a defendant from possessing firearms while serving a criminal sentence.[2] That rationale is consistent with our history and tradition, *see Moore*, 111 F.4th at 269–73, and it is enough to resolve this case.[3] I therefore concur on this basis that § 922(g)(1) is constitutional as applied to Goins.

---

[1]*See, e.g.*, *Gall v. United States*, 552 U.S. 38, 48 (2007) (noting the Constitution permits "substantial[] restrict[ions]" on a probationer's exercise of numerous constitutional rights, including Fourth Amendment rights, the right to travel, and the right to work); *Morrissey v. Brewer*, 408 U.S. 471, 480–90 (1972) (recognizing the diminished due process rights of parolees); *United States v. Ritter*, 118 F.3d 502, 504–06 (6th Cir. 1997) (discussing permissible limitations on First Amendment rights for persons on supervised release).

[2]For present purposes, I see no meaningful distinction between the period of federal supervised release at issue in *Moore* and Goins's probationary sentence imposed by a Kentucky state court. Both involve service of a criminal sentence in a non-custodial setting and a condition that the defendant must not possess a firearm during the sentence.

[3]There may be other justifications for restricting a probationer's right to bear arms. Consider a scenario where, in lieu of a custodial sentence of imprisonment, a defendant bargains for a probationary sentence that carries a firearm restriction. There, the defendant may be thought of as accepting a limitation on his rights in exchange for the reduced restraints on his liberty during probation than if he remained incarcerated. Such a bargained-for exchange may justify a conclusion that the probationer waived his right to keep and bear arms. *Cf. United States v. Barnett*, 415 F.3d 690, 692 (7th Cir. 2005) (holding that a defendant waived his Fourth Amendment rights as a condition of probation, and explaining that the defendant preferred to "experience the lesser restraint of probation" over "serv[ing] a prison sentence").