RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0269p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JAYLIN E. MORTON,

*Defendant-Appellant*.

No. 24-5022

─────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:23-cr-00045-1—Karen K. Caldwell, District Judge.

Decided and Filed:  December 16, 2024

Before: GILMAN, READLER, and BLOOMEKATZ, Circuit Judges.

─────────────

## COUNSEL

**ON BRIEF:**  Robert L. Abell, ROBERT ABELL LAW, Lexington, Kentucky, for Appellant. Amanda Harris Huang, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

BLOOMEKATZ, J., delivered the opinion of the court in which GILMAN, J., concurred, and READLER, J., concurred in part and in the judgment.  READLER, J. (pg. 10), delivered a separate concurring opinion.

─────────────

## OPINION

─────────────

BLOOMEKATZ, Circuit Judge.  A grand jury indicted Jaylin Morton for possessing a firearm as a felon.  *See* 18 U.S.C. § 922(g)(1).  Morton moved to dismiss the indictment, arguing that the prosecution violated his Second Amendment rights.  The district court denied his motion, and Morton conditionally pleaded guilty.  Morton now appeals the district court's denial of his

motion to dismiss. Because Morton's criminal history demonstrates dangerousness, his conviction is consistent with the Second Amendment as interpreted in this court's recent decision in *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024). We affirm.

**BACKGROUND**

On August 3, 2022, Lexington Police Department officers observed Jaylin Morton in a shopping center parking lot and began to approach him. They recognized Morton and knew that he had outstanding arrest warrants. Morton realized the officers were approaching and evasively ducked into a store. When the officers found him, he resisted arrest and attempted to flee, but was unsuccessful. After arresting him, the officers walked Morton to his car, where they saw a digital scale in plain view. The officers then searched the vehicle and found two handguns: a pistol with an extended magazine hidden under the driver's seat and another pistol hidden under a rear floorboard, which was later determined to belong to someone else. After a struggle in the parking lot, the officers transported Morton to a county jail.

A grand jury indicted Morton for possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). Morton had at least six prior felony convictions: two for possessing a firearm as a felon, two for fleeing or evading the police, one for burglary, and one for intimidating a participant in a legal process. Several of the felony convictions resulted from a series of events in 2019. Early that year, after a verbal altercation, Morton fired a shot at his ex-girlfriend and her family. A few weeks later, Morton showed up at her apartment with a handgun on his person and verbally harassed her. When she told him she would call the police if he didn't leave, he took her phone to prevent her from doing so, threatened her several times, and then left. Two days later, officers located Morton to arrest him for these offenses, and he fled. While fleeing, he tossed aside a handgun and narcotics. In addition, Morton has multiple assault convictions. The first came in 2015, when he entered a woman's house without permission, cursed at her, and assaulted her. The second arose in 2020, from a domestic-violence incident in which Morton punched his then-girlfriend in the head during an argument.

Morton moved to dismiss his indictment based on the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). In his view, § 922(g)(1) violates the

Second Amendment as applied to him because his prior felony convictions were for nonviolent crimes. Morton also argued that Congress cannot constitutionally disarm felons because the federal government lacked the power to disarm felons—or anyone—at the time of the Constitution's ratification. The district court denied his motion. It reasoned that the Second Amendment allows disarming Morton because his prior felonies demonstrate that he is a "serious and direct threat to public safety." Op. & Order, R. 29, PageID 161–62. It thus concluded that § 922(g)(1) constitutionally applied to him.

After the district court denied his motion, Morton conditionally pleaded guilty. As part of the plea agreement, he retained the right to appeal the district court's denial of his motion to dismiss. Morton now appeals.

**ANALYSIS**

Morton argues that the district court should have dismissed the indictment because § 922(g)(1) is unconstitutional as applied to him. We review the district court's denial of his motion de novo because it implicates the constitutionality of a federal statute. *See United States v. Napier*, 233 F.3d 394, 397 (6th Cir. 2000). Since Morton appealed, both the Supreme Court and this court have set forth new precedents governing Second Amendment challenges to firearms regulations. We first review the controlling law for Morton's appeal. We then apply these new standards to Morton's case, holding that the district court correctly denied his motion to dismiss.

**I.      Controlling Law**

The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. There are, however, limits on this constitutional right. *See District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). Congress can regulate firearm possession so long as doing so comports with the United States' historical tradition of firearm regulation. *Bruen*, 597 U.S. at 17.

The Supreme Court established a test for evaluating whether a given firearm regulation violates the Second Amendment in *New York State Rifle & Pistol Ass'n v. Bruen*. *Id.* at 24.

We first discern whether the "Second Amendment's plain text covers an individual's conduct." *Id.* More specifically, we ask if the defendant is part of "the people" and if the "right" they assert is "to keep and bear Arms," as defined in *District of Columbia v. Heller*, 554 U.S. 570. *Bruen*, 597 U.S. at 31–32. If so, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24, 33–34. The Supreme Court anticipated that "[i]n some cases, that inquiry will be fairly straightforward," such as when the challenged regulation "addresses a general societal problem that has persisted since the 18th century." *Id.* at 26. But it also recognized that "other cases" could be more difficult if the challenged regulation addresses modern technologies, societal concerns, or other issues "unimaginable at the founding." *Id.* at 27–28. In that situation, the Court instructed us to reason by analogy to determine whether the modern and historical regulations are "relevantly similar." *Id.* at 28–29.

The Supreme Court applied that test in *United States v. Rahimi*, 602 U.S. 680 (2024), giving us further insight into using historical analogues in the Second Amendment context. In *Rahimi*, the Supreme Court considered a challenge to 18 U.S.C. § 922(g)(8), which disarms certain individuals who are subject to domestic-violence restraining orders. *Id.* at 684–85. To determine whether a regulation is "relevantly similar" to firearms regulations that "our tradition is understood to permit," the Court clarified that we should consider whether the modern regulation is "consistent with the principles that underpin our regulatory tradition." *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29). We must consider "[w]hy and how" the modern law burdens the Second Amendment right and compare it to the "[w]hy and how" of historical firearms regulations. *Id.* To satisfy *Bruen*'s requirements, the regulation need only have a "historical analogue," not a "historical twin." *Id.* at 700–01 (quoting *Bruen*, 597 U.S. at 30).

For § 922(g)(8), considered in *Rahimi*, the Court identified such historical analogues in two "founding era regimes"—surety laws and "going armed" laws. *Id.* at 698. Those laws provided for disarming, at least temporarily, "individuals found to threaten the physical safety of another." *Id.* at 693–99. Similarly, § 922(g)(8)—which applies while an individual that the court deems dangerous remains under a restraining order—temporarily disarms "individuals who pose a credible threat to the physical safety of others." *Id.* at 693. Therefore, the Court

concluded that § 922(g)(8) fit within our historical tradition and "comport[ed] with the principles underlying the Second Amendment." *Id.* at 692.[1]

Following *Rahimi*, our court resolved a Second Amendment challenge to the statute at issue in this case, 18 U.S.C. § 922(g)(1), which disarms persons who have previously been convicted of a felony. *Williams*, 113 F.4th 637. In *Williams*, the court rejected the defendant's facial challenge to the statute. *Id.* at 657. It also held that his § 922(g)(1) conviction did not offend the Second Amendment given his prior convictions for violent crimes, including robbery with a deadly weapon, attempted murder, and hiding a firearm that was used to murder a police officer. *Id.* at 662. In reaching that conclusion, our court utilized the *Bruen* framework and made several determinations that are applicable to Morton's challenge.

First, as to the text, *Williams* held that felons are part of "the people" protected by the Second Amendment because, based on *Heller*'s reasoning, "[n]othing in the Second Amendment's text draws a distinction" based on criminal history. *Id.* at 649. And, following *Heller*, § 922(g)(1) implicates "the right" to possess a gun—i.e., to "keep and bear arms." *Id.* at 649–50. Because the defendant in *Williams* was convicted for possession of a "loaded pistol," there was no question that the particular firearm at issue fell within the scope of the "arms" described in *Heller*. *Id.* at 642; *see also id.* at 649–50 (quoting *Heller*, 554 U.S. at 582).

---

[1]The facts in this case look like *Rahimi* in some ways because Morton committed domestic-violence offenses, after which the state court determined that Morton was a threat to the public. But we cannot rest our reasoning entirely on *Rahimi* because it is unclear whether *Rahimi*'s reasoning depended on the temporary nature of the firearm deprivation under § 922(g)(8), which would make its analysis less helpful when considering the constitutionality of permanent disarmament under § 922(g)(1). On one hand, *Rahimi* compared the temporary nature of the historical surety laws with the fact that § 922(g)(8) "only prohibits firearm possession so long as the defendant 'is' subject to a restraining order." *Rahimi*, 602 U.S. at 699; *see also id.* at 713 (Gorsuch, J., concurring) ("We do not resolve whether the government may disarm an individual permanently."). On the other hand, the other primary historical analogue on which the Supreme Court relied in *Rahimi*—"going armed" laws—provided for forfeiture of arms (at least the arm involved in the offense), which could be analogized to modern laws requiring permanent firearm deprivation. *Id.* at 697–98. And the Court at times summarized its historical analysis in *Rahimi* without respect to time limitations. *See, e.g., id.* at 693 ("[T]he Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others."); *id.* at 698 ("When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."). This uncertainty does not matter here because our own circuit precedent provides further historical analysis that recognizes a history and tradition of allowing for permanent disarmament in some circumstances. We follow that analysis here. *See United States v. Williams*, 113 F.4th 637, 650–57 (6th Cir. 2024); *United States v. Goins*, 118 F.4th 794, 798–802 (6th Cir. 2024).

Next, as to the historical tradition, *Williams* held that, "for centuries," governments have determined that whole classes of individuals were presumptively dangerous and "had to be kept away from arms." *Id.* at 657. Surveying the rules of "early English kings and Parliament alike," and looking to practices that survived "the odyssey from the Old World to the New," the court held that there is a historical tradition of denying arms to "dangerous groups." *Id.* at 650, 652. But any member of such a group "could keep arms if they could demonstrate they didn't pose a danger" in a civil proceeding, such as by "swearing a loyalty oath." *Id.* at 651–52, 657. Accordingly, *Williams* held that Congress may criminalize firearm possession by classes of people it believes are dangerous, including felons, as long as individuals have an opportunity to "demonstrate that their particular possession of a weapon pose[s] no danger to peace." *Id.* at 657.[2] The *Williams* court envisioned a civil process where felons could restore their right to

---

[2] We are bound by this historical analysis and the conclusions drawn from it as applied to felons who, as in *Williams*, have committed violent crimes against a person. *See* 113 F.4th at 651–58. We note, however, that there is significant disagreement about much of the analysis that the Supreme Court should resolve.

*First*, the historical analysis in *Williams* draws primarily from laws that forbade Catholics, seditious libelers, Native Americans, loyalists, individuals who had engaged in "actual rebellion," and Black people from possessing firearms. *See* 113 F.4th at 651–57. From this, *Williams* concludes that Congress can permanently disarm anyone who it deems in a class of dangerous people. *See id.* at 657. Other scholars and jurists, including on our court, have looked at this same history and concluded that it reflects a tradition of disarming those who pose a threat to the government, not to those who may pose a threat to neighbors or other individuals generally. *See Rahimi*, 602 U.S. at 755 (Thomas, J., dissenting) ("These laws were driven in large part by a desire to suppress rebellion."); *Kanter v. Barr*, 919 F.3d 437, 457–58 (7th Cir. 2019) (Barrett, J., dissenting) (suggesting laws disarming Catholics and other "distrusted people" were meant to "deal with the potential threat coming from armed citizens who remained loyal to another sovereign" (cleaned up)), *abrogated by Bruen*, 597 U.S. 1; *Range v. Att'y Gen. U.S.*, 69 F.4th 96, 105 (3d Cir. 2023) (en banc) (stating that "any such analogy" to "Founding-era governments disarm[ing] groups they distrusted," like racial and religious minorities, would be "far too broad" (quotation marks omitted)), *vacated sub nom.*, *Garland v. Range*, 144 S. Ct. 2706 (2024) (mem); *Goins*, 118 F.4th at 805–06 (Bush, J., concurring) (noting the majority's historical analogues involved disarming groups "because the government considered them likely to take up arms against the state"); *United States v. Duarte*, 101 F.4th 657, 679 (9th Cir. 2024) (concluding that early legislatures passed laws disarming "British Loyalists, Catholics, Indians, and Blacks . . . to prevent armed insurrections by dangerous groups united along political, ideological, or social lines"), *reh'g en banc granted*, *opinion vacated*, 108 F.4th 786 (9th Cir. 2024) (mem). Of course, armed rebellion by groups purportedly oppositional to the government would pose a danger to society more generally, but on this reading of the historical record, laws disarming those groups targeted a different type of danger than the felon-in-possession laws. Therefore, depending on how broadly a court draws the analogy, a tradition of disarming potentially rebellious groups arguably would not map on to our modern felon-in-possession statute.

*Second*, *Williams* draws its history of disarming dangerous groups primarily from the English kings and colonial era. But, for one thing, the Court stated in *Rahimi* that "[b]y the time of the founding, . . . state constitutions and the Second Amendment had largely eliminated governmental authority to disarm political opponents." 602 U.S. at 694. And for another, *Bruen* does not decide whether courts should discern the Second Amendment's history and tradition by looking only at relevant laws from 1791, when the Second Amendment was adopted, from 1868, when the Fourteenth Amendment incorporated it against the states, or from both. *See* 597 U.S. at 34. In *Williams*, our court almost exclusively discussed the history and tradition of group-based disarmament in 1791, except for turning

have a firearm by proving they were not dangerous, allowing them to exercise their Second Amendment right without fear of prosecution under § 922(g)(1). *See id.* at 661 (referring to a defunct program of the Bureau of Alcohol, Tobacco, Firearms, and Explosives). But, at a minimum, the court recognized that a felon must be given the chance to challenge their § 922(g)(1) indictment as applied to them once charged. *See id.*

From this history, the court recognized that many applications of § 922(g)(1) would be constitutional. *Id.* at 657. *Williams* focused on "crimes against the person," such as "murder, rape, assault, and robbery." *Id.* at 658. Indeed, the defendant in *Williams* committed armed robbery and had attempted murder. For those who have committed "violent crimes" like these, the court explained that the offense itself is "at least strong evidence" that the individual is dangerous. *Id.* But it also suggested that § 922(g)(1) "might be susceptible to an as-applied challenge." *Id.* at 657. It did not reach a holding as to other types of crimes not at issue in *Williams*, including burglary or drug trafficking, which "do not always involve an immediate and direct threat of violence against a particular person" but "may nonetheless pose a significant threat of danger." *Id.* at 659. And the court thought that convictions for crimes that "cause no physical harm to another person or the community" were unlikely to make a person dangerous. *Id.* The court was clear that it was not mandating a categorical analysis, but instead making "the

---

to 1868 to acknowledge that the Fourteenth Amendment would have rendered unconstitutional laws "[c]lassifying people as dangerous simply because of their race and religion." 113 F.4th at 656. *Bruen* and *Rahimi* do not provide guidance on whether laws that were unconstitutional in 1868 are still relevant to our Second Amendment history-and-tradition analysis.

*Third*, even assuming that we look just to 1791, as we did in *Williams*, there were felons then, including individuals who committed armed robbery, attempted murder, and armed burglary. *Gamble v. United States*, 587 U.S. 678, 706 n.15 (2019) (quoting 4 Blackstone 71) (robbery); *Mullaney v. Wilbur*, 421 U.S. 684, 693 (1975) (citing 4 Blackstone 190) (murder); *Quarles v. United States*, 587 U.S. 645, 649 (2019) (citing 4 Blackstone 224) (burglary). And "societal concerns" about repeat criminals were not "unimaginable at the founding." *See Bruen*, 597 U.S. at 28. Yet, as now-Justice Barrett concluded when dissenting in *Kanter v. Barr*, there was no founding-era historical tradition of disarming all felons. *See* 919 F.3d at 454 (Barrett, J., dissenting). To be sure, we need a law that is "relevantly similar," not a historical twin. But when the same criminal conduct existed at the founding yet carried a different punishment, can we ignore the *lack* of a historical twin? And how should a court weigh the fact that the punishment at the founding—say, execution—may have been more severe than disarmament? *Williams* rejected reliance on the death penalty for felons at the founding as an appropriate historical analogue to § 922(g)(1) because felons "don't lose other rights guaranteed in the Bill of Rights even though an offender who committed the same act in 1790 would have faced capital punishment." 113 F.4th at 658. But *Rahimi* also reasoned that because the "going armed laws provided for imprisonment . . . to respond to the use of guns to threaten the physical safety of others," the "lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible." 602 U.S. at 699. These are all issues that the Supreme Court should address when it analyzes the constitutionality of § 922(g)(1).

commonsense point" that the commission of some offenses "will more strongly suggest" dangerousness. *Id.* at 660. And it clarified that the dangerousness inquiry should consider the "defendant's entire criminal record—not just the specific felony underlying his § 922(g)(1) conviction"—including "past convictions in the record, as well as other judicially noticeable information." *Id.* at 659–60.

## II.     As Applied to Morton

Under this framework, § 922(g)(1) is constitutional as applied to Morton. Following *Williams*, we ask if a defendant's criminal history demonstrates dangerousness, including "crimes against the person." *Id.* at 658, 661–62. Morton's criminal history undoubtedly does. Among other offenses, Morton was previously convicted for wanton endangerment and possessing a firearm as a felon after he shot at his ex-girlfriend and her family, and then showed up at her house a few weeks later and verbally harassed her with a gun on his person. When she tried to call the police, Morton took her phone to prevent her from doing so, and then threatened her several times before leaving. On another occasion, Morton was convicted of assault resulting from a domestic-violence incident after he punched his then-girlfriend in the head during an argument. Although the latter offense is not one of the felonies underlying the indictment, we may look at Morton's whole criminal history in assessing dangerousness. *Id.* at 659–60. Moreover, we are not confined to the fact of conviction alone, but may consider how an offense was committed. *See id.* at 663 (rejecting a "categorical" approach). Accordingly, Morton's convictions demonstrate his dangerousness, making § 922(g)(1) constitutional as applied to him.

Morton also renews on appeal his argument that § 922(g)(1) is inconsistent with our nation's history and tradition because the federal government lacked the power to disarm felons—or anyone—at the time of ratification. Instead, Morton argues, that power rested with the states. This appears to be a facial challenge to § 922(g)(1), which we rejected in *Williams*. *Id.* at 657. Additionally, both the Supreme Court and our court have looked to early colonial and state laws, not exclusively to *federal* laws at the founding, to define the scope of the Second Amendment right. *See Rahimi*, 602 U.S. at 695–98 (§ 922(g)(8)); *Goins*, 118 F.4th at 798–99 (§ 922(g)(1)); *United States v. Gore*, 118 F.4th 808, 812–15 (6th Cir. 2024) (§ 922(j), (n)).

Nor do we need to remand for the district court to reassess dangerousness. Morton argues that the district court did not perform a sufficiently intensive inquiry under our precedents, but we disagree. The district court started its order by listing Morton's prior felonies, two of which involved a firearm. The district court had access to the state-court judgments for these convictions, which were attached as exhibits to Morton's memorandum supporting his motion to dismiss. Some of these judgments explicitly referred to the nature of the offense as "dangerous" or "violent." *See* 2015 State Court Judgment, R. 18-2, PageID 61; 2021 State Court Judgment, R. 18-5, PageID 71. From this material, the district court concluded that Morton's "prior felonies represent a serious and direct threat to public safety." Op. & Order, R. 29, PageID 161–62. *Williams* was decided after Morton's § 922(g)(1) conviction, but the district court made the requisite individualized assessment of dangerousness nonetheless. *See Williams*, 113 F.4th at 657–58.

Morton's criminal record demonstrates dangerousness, specifically that he has committed "violent" crimes "against the person." *Id.* at 658. So his conviction is consistent with the Second Amendment as interpreted in *Williams*. Accordingly, § 922(g)(1) is constitutional as applied to him.

## CONCLUSION

For these reasons, we affirm the district court's denial of Morton's motion to dismiss the indictment.

---------------------

**CONCURRENCE**

---------------------

CHAD A. READLER, Circuit Judge, concurring in part and concurring in the judgment. In *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024), and *United States v. Goins*, 118 F.4th 794 (6th Cir. 2024), our Court applied the holdings of *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), and *United States v. Rahimi*, 144 S. Ct. 1889 (2024), to 18 U.S.C. § 922(g)(1). Those decisions render the legal issues in today's appeal straightforward. With that in mind, I concur in the body of the majority opinion, but do not join its footnotes.