**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1843
_____

UNITED STATES OF AMERICA

v.

DIONTAI MOORE,
                    Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-21-cr-00121-001)
District Judge: Honorable Robert J. Colville
_____

Argued on April 16, 2024

Before: HARDIMAN, SMITH, and FISHER, *Circuit Judges*.

(Filed: August 2, 2024)

Lisa B. Freeland
Stacie M. Fahsel [Argued]
Renee Pietropaolo
Office of Federal Public Defender

1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222

 Counsel for Appellant

William Glaser [Argued]
United States Department of Justice
Criminal Division
Room 1264
950 Pennsylvania Avenue NW
Washington, DC 20530

Eric G. Olshan
Adam N. Hallowell
Laura S. Irwin
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219

 Counsel for Appellee

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

 This appeal arises under the Second Amendment to the United States Constitution and presents a question of first impression in this Court. Does a convict completing his

2

sentence on supervised release have a constitutional right to possess a firearm? The answer is no.

I

A

In 2008, federal agents collaborated with Pennsylvania State Police to investigate Appellant Diontai Moore for drug crimes. As part of this investigation, a confidential informant bought nearly a gram of cocaine from Moore. The police arrested Moore and searched his home, where they found more than three grams of cocaine base. Moore was charged with distribution of less than five grams of cocaine base. *See* 21 U.S.C. § 841(b)(1)(C). He pleaded guilty and was sentenced to 72 months' imprisonment followed by 3 years' supervised release.

In 2013, while Moore was on supervised release for that cocaine conviction, Pittsburgh Police noticed an unusual bulge under Moore's shirt. After a struggle, the officers arrested Moore and recovered a handgun from him. Moore was then charged with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1). In 2015, Moore pleaded guilty. He was sentenced to 60 months' imprisonment followed by 3 years' supervised release. As a condition of his supervised release, Moore was not allowed to "possess a firearm, ammunition, destructive device, or any other dangerous weapon." Supp. App. 3.

B

Moore was released from prison and began his three-year term of supervised release in July 2019. Less than two

3

years later, on a Friday night in March 2021, Moore went out drinking with friends to celebrate his birthday. Moore returned that night to the Pittsburgh townhome of his fiancée Gwendolyn Pullie, where he had been living with Pullie and her three minor children for about a year.

Around 4:00 a.m., Moore and Pullie were upstairs talking about "how [Moore] went to the club," when they heard the dog barking downstairs in the kitchen. App. 279. Moore later described the dog as "going f***ing crazy." *Id.* As surveillance video footage shows, two figures entered the parking lot behind the townhome and broke into Pullie's car, which was parked in a spot next to the townhome's back door. Pullie later testified she felt "terrified" that she was "in harm's way." App. 181. She also "felt like someone was at [her] back door." App. 184. So she and Moore went downstairs, where they saw shadowy figures near the back of the house.

Pullie then went upstairs to grab a handgun that she kept in a safe under her bed. She woke up her children, returned downstairs, and handed Moore the loaded weapon. Pullie left through the front door, taking her children with her. She and the children headed for the family's other car, which was parked on the street in front of the townhome.

While Pullie left with the children, Moore took the gun and went out the back door of the townhome to confront the trespassers. The two intruders, who had broken into Pullie's car, ran away at the sight of Moore. While they were fleeing, Moore fired three shots. Moore hit one of the intruders in the back of the thigh. Shortly after hearing the gunshots, Pullie

4

drove her children to her cousin's house, where she dropped them off.

Later that weekend, Pullie met with a local detective, turned in her gun, and spoke about the incident. On Monday, Moore called his federal probation officer. He admitted his involvement in the shooting and said that "he fired at individuals he thought were breaking into his residence." Supp. App. 7.

C

Within weeks, Moore was charged as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The indictment listed Moore's previous federal convictions for distributing cocaine base and being a felon in possession of a firearm, as well as previous state drug trafficking convictions.

Moore pleaded guilty to violating § 922(g)(1). In doing so, he reserved the right to argue on appeal that § 922(g)(1) is unconstitutional. The District Court entered judgment against Moore, sentencing him to 84 months' imprisonment followed by 3 years' supervised release. Moore timely appealed the judgment of conviction.[1]

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291. We review the District Court's legal conclusions de novo and its factual findings for clear error. *See United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011).

5

II

A

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. As an adult citizen, Moore is one of the "people" whom the Second Amendment presumptively protects. *See Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 127 (3d Cir. 2024). And the charge at issue punishes Moore for quintessential Second Amendment conduct: possessing a handgun. *See District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). So the Government bears the burden of justifying its regulation. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022); *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024).[2]

B

The Government can satisfy its burden only "by demonstrating that [its regulation] is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597

---

[2] That Moore was on supervised release does not relieve the Government of its burden to justify its regulation of Moore's arms-bearing conduct. To hold otherwise would relegate the Second Amendment to "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (cleaned up). The First and Fourth Amendments apply to convicts on parole, probation, and supervised release. *See Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 125 (1977) (First Amendment); *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (Fourth Amendment). So too for the Second Amendment.

U.S. at 24. To do so, it must "identify a well-established and representative historical analogue," which need not be "a historical twin" or a "dead ringer." *Id.* at 30 (emphasis omitted).

In analyzing the Government's proposed historical analogues, we "must ascertain whether the [challenged] law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29). "*Why* and *how* the regulation burdens the right are central to this inquiry." *Id.* (emphasis added). As compared to its historical analogue, a modern regulation must "impose a comparable burden on the right of armed self-defense, and . . . that burden [must be] comparably justified." *Bruen*, 597 U.S. at 29. In other words, a modern firearms regulation passes constitutional muster only if it is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

To justify disarming Moore while he was on supervised release, the Government cites the tradition of forfeiture laws, which temporarily disarmed convicts while they completed their sentences. For example, a 1790 Pennsylvania statute provided that "every person convicted of robbery, burglary, sodomy or buggery . . . shall forfeit to the commonwealth all . . . goods and chattels whereof he or she was . . . possessed at the time the crime was committed . . . and be sentenced to undergo a servitude of any term . . . not exceeding ten years." Act of Apr. 5, 1790, 13 *Statutes at Large of Pennsylvania*, at 511, 511–12 (James T. Mitchell & Henry Flanders eds., 1896).

That 1790 Pennsylvania law is analogous to disarming convicts on supervised release because it burdened arms-bearing conduct in the same way and for the same purpose. The

7

law seized all of the convict's possessions, including his weapons, as part of his "servitude" or sentence. *Id.* So it was like disarming a convict on supervised release—which is a "part of the same sentence" as a term of imprisonment. *Mont v. United States*, 587 U.S. 514, 524 (2019). And the Pennsylvania law burdened the right to bear arms for the same reasons that we now burden the rights of convicts on supervised release: to deter criminal conduct, protect the public, and facilitate the convict's rehabilitation. *Compare* 18 U.S.C. § 3583(c) (instructing courts to consider these factors in imposing supervised release), *with* Act of Apr. 5, 1790, 13 *Statutes at Large of Pennsylvania*, at 511 (intending "to reform" and "to deter").

To be sure, the 1790 Pennsylvania law is not a dead ringer for § 922(g)(1). The old law deprived convicts of all their goods—including their weapons—while § 922(g)(1) deprives them of firearms and ammunition alone. But the founding-era law and the modern statute need not be "identical." *Rahimi*, 144 S. Ct. at 1901. The old law took the convict's possessions, including his weapons, and then imprisoned him, preventing reacquisition until the sentence was complete. Because it disarmed the convict while he served his criminal sentence, the 1790 Pennsylvania law is sufficiently analogous to § 922(g)(1) as applied to convicts on supervised release.

The relevance of the 1790 law is buttressed by the fact that the Pennsylvania Constitution included a precursor to the federal Constitution's Second Amendment. *Cf. Roth v. United States*, 354 U.S. 476, 482 (1957) (state analogues to First Amendment). The Pennsylvania Constitution of 1776 provided: "the people have a right to bear arms for the defence of themselves and the state." Pa. Const. of 1776, ch. I, art. XIII.

8

And as revised in 1790, it stated: "the right of the citizens to bear arms, in defence of themselves and the state, shall not be questioned." Pa. Const. of 1790, art. IX, § XXI.

At the same time that it provided these guarantees, Pennsylvania enacted multiple forfeiture provisions in addition to the 1790 law. For example, the legislature stipulated that counterfeiters were subject to imprisonment "and moreover [were required to] forfeit all [their] . . . goods and chattels." Act of Nov. 26, 1779, § 2, 10 *Statutes at Large of Pennsylvania*, at 12, 15–16 (James T. Mitchell & Henry Flanders eds., 1904). Likewise, Pennsylvania regulations intended to protect the Philadelphia market from competition required a repeat offender to "forfeit all his goods, and [be] imprisoned at the discretion of the court." Act of Apr. 5, 1779, 9 *Statutes at Large of Pennsylvania*, at 387, 388–89 (James T. Mitchell & Henry Flanders eds., 1896).

The Pennsylvania forfeiture laws just mentioned were not outliers; they were sufficiently well-established and representative in the late 18th century to serve as historical analogues. *See Bruen*, 597 U.S. at 30. For example, Massachusetts provided:

> [A]ll persons who, for the space of one hour after [an anti-riot] proclamation [is] made . . . shall unlawfully, routously, riotously and tumultuously continue together, or shall wilfully . . . hinder any such officer . . . from making the said proclamation, shall forfeit all their . . . goods and chattels to this Commonwealth, or such part thereof as shall be adjudged by the Justices, before whom such offence shall be tried . . . and

suffer imprisonment for a term not exceeding twelve months, nor less than six months.

Act of Oct. 28, 1786, 1 *Laws of the Commonwealth of Massachusetts*, at 346, 347 (J.T. Buckingham ed., 1807); *see also* Mass. Const. of 1780, pt. I, art. XVII (recognizing the "right to keep and to bear arms"). Virginia had a similar penalty for counterfeiting:

[I]f any person within this commonwealth shall forge or counterfeit, alter or erase, any certificate of money . . . , every person so offending, and being lawfully convicted, shall forfeit his whole estate, real and personal, . . . and shall be obliged to serve on board some armed vessel . . . without wages, not exceeding seven years.

Act of May 5, 1777, ch. 5, § 4, 9 *Virginia Statutes at Large*, at 286, 287 (William Waller Hening ed., 1821). Unlike the outlier territorial laws that the Supreme Court has rejected, *see Bruen*, 597 U.S. at 67–68, these forfeiture laws came from populous States that sent the most representatives to the First Congress, *see* U.S. Const. art. I, § 2.

Disarming convicts as part of their sentences continued into the 19th century. For example, Kentucky criminalized "go[ing] with force and arms before courts." Act of Dec. 19, 1801, § 33, *Collection of All the Public and Permanent Acts of the General Assembly of Kentucky*, at 360, 371 (Harry Toulmin ed., 1802) (capitalization altered). Those who violated that law were required "to forfeit their arms to the commonwealth," and were "fined and imprisoned at the discretion of a jury." *Id.* That disarmament was compelled even though the Kentucky Constitution stated that "the rights of the citizens to bear arms

in defence of themselves and the State shall not be questioned." Ky. Const. of 1799, art. X, § 23. Unlike more general forfeiture laws, which required forfeiture of *all goods*, this law specifically required forfeiture of *arms* as part of a criminal sentence.

Similarly, a founding-era Massachusetts law specifically disarmed offenders as part of their rehabilitation and reintegration into the community. In the wake of Shays' Rebellion, "the Massachusetts legislature made rebels who had taken up arms against the state swear allegiance and give up their arms for three years before they could be pardoned." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) (cleaned up). To qualify for pardon, the rebels were required to "deliver up their arms to, and take and subscribe the oath of allegiance, before some Justice of the Peace." Act of Feb. 16, 1787, ch. VI, 1787 Mass. Acts 555. If the rebels satisfied certain conditions for three years, those arms would be "returned to the . . . persons who delivered the same, at the expiration of the said term of three years." *Id.* at 556. The temporary disarmament imposed by that law is also akin to disarmament during a criminal sentence.

The bottom line is this: during the founding era, forfeiture laws temporarily disarmed citizens who had committed a wide range of crimes.[3] Convicts could be required

---

[3] The crimes referenced from the early days of the Republic differ from Moore's felon-in-possession crime. But they all stand for the proposition that convicts could be disarmed while serving their sentences. So those founding-era laws serve as relevant analogues to § 922(g)(1), as it applies to convicts on supervised release. The context is critical because a law which constitutes an "an appropriate analogue" in one context may

11

to forfeit their weapons and were prevented from reacquiring arms until they had finished serving their sentences. This historical practice of disarming a convict during his sentence—or as part of the process of qualifying for pardon—is like temporarily disarming a convict on supervised release. After all, "[t]he defendant receives a term of supervised release thanks to his initial offense, and . . . it constitutes a part of the final sentence for his crime." *United States v. Haymond*, 588 U.S. 634, 648 (2019) (plurality opinion); *see also United States v. Island*, 916 F.3d 249, 252 (3d Cir. 2019) ("The supervised release term constitutes part of the original sentence.") (cleaned up). Consistent with our Nation's history and tradition of firearms regulation, we hold that convicts may be disarmed while serving their sentences on supervised release.

Moore tries to distinguish supervised release from founding-era forfeiture laws. He argues that supervised release differs materially from forfeiture because supervised release occurs after the term of imprisonment. We disagree primarily because "analogical reasoning under the Second Amendment is n[ot] a regulatory straightjacket." *Bruen*, 597 U.S. at 30. In addition, Moore's argument misconstrues the historical record. The forfeiture of property and limitation on rights occurred while the convict was serving out his sentence, not only while he was physically in prison. For example, Virginia convicts served out their sentences by doing forced labor on a ship, not in prison. *See* Act of May 5, 1777, 9 *Virginia Statutes at Large*, at 287. And convicts sentenced to prison could serve part of their sentences outside of prison. *See* Act of Dec. 22, 1787, ch.

---

"not [be] a proper historical analogue" in another. *Rahimi*, 144 S. Ct. at 1902.

12

11, 1 *Public Acts of the General Assembly of North Carolina*, at 434 (James Iredell and Francois-Xavier Martin, eds. 1804).

Moore also suggests that supervised release cannot be subject to historical analogues because it "is a modern innovation . . . created by the federal government in 1984." Reply Br. 23 (citing *Haymond*, 588 U.S. at 651–52). This argument is a nonstarter because requiring "regulations identical to ones that could be found in 1791" is just "as mistaken as applying the protections of the [Second Amendment] only to muskets and sabers." *Rahimi*, 144 S. Ct. at 1898. Although criminal justice worked differently in the founding era than it does today, it is also true that a convict could be temporarily disarmed as part of his sentence. So the "prohibition on the possession of firearms" by a convict subject to a criminal sentence "fits neatly within the tradition" embodied by forfeiture laws. *Rahimi*, 144 S. Ct. at 1901.

Our conclusion is bolstered by the Supreme Court's recent decision in *Rahimi*. As the Court explained, early American surety and affray laws establish the principle that "[w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi*, 144 S. Ct. at 1901. The Court applied that principle to uphold the federal law prohibiting an individual subject to a domestic violence restraining order from possessing firearms. *See id.* (citing 18 U.S.C. § 922(g)(8)). Taken together, the early American forfeiture laws—which required forfeiting property in general and arms in particular—likewise yield the principle that a convict may be disarmed while he completes his sentence and reintegrates into society. And this principle justifies applying § 922(g)(1) to Moore, a convict on supervised release.

13

C

Moore's other counterarguments are unpersuasive. First, Moore argues that his status as a supervised releasee cannot support his felon-in-possession conviction. According to Moore, we may consider only the facts alleged in the indictment—such as the predicate offenses that made him a felon. But Moore cites no authority to support this proposition. That is unsurprising because an as-applied challenge requires us to ask whether a statute's "application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011) (cleaned up). "In order to mount a successful as-applied challenge, [Moore] must show that under these particular circumstances he was deprived of a constitutional right." *Id.* at 406 (cleaned up). And "these particular circumstances" include facts beyond the predicate offenses alleged in the indictment. So the circumstances of a criminal offense can justify rejecting an as-applied challenge to a conviction regardless of whether they were charged. This is especially so where, as here, no party questions the fact that we deem constitutionally relevant: Moore was on supervised release when he possessed the firearm. *See* Moore Br. 5 (conceding this fact).

Moore also argues that § 922(g)(1) violates the Second Amendment as applied to his possession of a firearm for protection at home. He notes that self-defense is the "*central component*" of the right, and "the home" is where the need for self-defense is "most acute." Moore Br. 44 (quoting *Heller*, 554 U.S. at 599, 628). Those truisms about the core of the Second Amendment do not dictate the outcome here. A prisoner's cell is his temporary home—and a prisoner may feel the need to defend himself against other prisoners—but that

14

does not entitle him to keep a firearm in prison. "Persons accused of crime, upon their arrest, have constantly been divested of their arms, without the legality of the act having ever been questioned." *State v. Buzzard*, 4 Ark. 18, 21 (Ark. 1842) (opinion of Ringo, C.J.). A prisoner on house arrest does not necessarily have a right to keep a weapon at home for self-defense, even though typical citizens do. The same is true for a prisoner on supervised release.[4]

Because history and tradition support disarming convicts who are completing their sentences, we reject Moore's as-applied challenge to his conviction for violating § 922(g)(1).[5]

\* \* \*

A convict completing his sentence on supervised release does not have a Second Amendment right to possess a firearm. So 18 U.S.C. § 922(g)(1) is constitutional as applied to Moore, and we will affirm his judgment of conviction.

---

[4] Of course, the doctrine of necessity or justification "is a valid defense to a felon-in-possession charge." *United States v. Alston*, 526 F.3d 91, 94 (3d Cir. 2008). But Moore failed to preserve the argument that this defense applies.

[5] Since we reject Moore's as-applied challenge to § 922(g)(1), his facial challenge also fails: he cannot "establish that no set of circumstances exists under which the Act would be valid." *Rahimi*, 144 S. Ct. at 1898 (cleaned up).