# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
January 13, 2025

Lyle W. Cayce
Clerk

No. 23-50840
CONSOLIDATED WITH
No. 23-50845

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

TAEGAN RAY CONTRERAS,

*Defendant—Appellant*.

Appeals from the United States District Court
for the Western District of Texas
USDC Nos. 7:23-CR-76-1, 7:21-CR-20-1

Before RICHMAN, GRAVES, and RAMIREZ, *Circuit Judges*.
JAMES E. GRAVES, JR., *Circuit Judge*:

Defendant-Appellant Taegan Ray Contreras was charged with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). He moved to dismiss the charge, contending that the statute violates the Second Amendment, both facially and as applied to him. The district court denied the motion, and Contreras was convicted and sentenced. He appealed, again raising facial and as-applied challenges to § 922(g)(1). We reiterate that §

No. 23-50840
c/w No. 23-50845

922(g)(1) is facially constitutional and conclude that it is constitutional as applied to Contreras. Accordingly, we AFFIRM.

I.

In 2020, Taegan Ray Contreras was twice caught possessing less than two ounces of marijuana, leading to misdemeanor convictions. The following year, the District Court for the Western District of Texas sentenced Contreras to 24 months' imprisonment and three years of supervised release for being a user in possession of a firearm. On September 30, 2022, Contreras began serving his term of supervised release for the firearm offense.

A few months later, in January 2023, Midland-Odessa Police Department detectives began investigating Contreras' social media accounts. They learned he possessed a pink Glock handgun, despite being prohibited from possessing a firearm due to his federal firearm conviction.

By late March, the detectives applied for a tracker warrant and placed the tracker on Mr. Contreras' vehicle. While surveilling the car, detectives saw Contreras commit a traffic violation. The detectives stopped Contreras, identified him as the driver, and smelled marijuana coming from the car. As they detained him, they smelled marijuana on his person. Then, as they searched the vehicle, they found eight grams of marijuana, packaging, a scale, marijuana residue scattered throughout, and a loaded pink 9-millimeter Glock with a 10-round magazine attached.

The detectives arrested Contreras and took him to the police department, where he admitted both that the firearm was his and that he was a convicted felon. The Government indicted Contreras on one count of possession of a firearm by a convicted felon pursuant to 18 U.S.C. § 922(g)(1).

2

No. 23-50840
c/w No. 23-50845

Contreras moved to dismiss the indictment, arguing that § 922(g)(1) violated the Second Amendment and was inconsistent with the Supreme Court's holding in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). The motion raised both facial and as-applied challenges. The district court denied the motion, concluding that § 922(g)(1) was facially constitutional, and distinguishing these facts from the cases where courts found the provision unconstitutional as applied.

Contreras and the Government entered a plea bargain agreement. For his part, Contreras entered a conditional plea of guilty to the felon-in-possession charge and affirmed the Government's factual basis of his illegal activities, albeit reserving his right to appeal the district court's denial of his motion to dismiss. In exchange, the Government agreed both to not pursue additional charges against him based on the incident and to not oppose his request for acceptance of responsibility.

After accepting his guilty plea, the district court sentenced Contreras to a guideline sentence of 21 months' imprisonment, three years of supervised release, a $100 special assessment, and ordered him to forfeit the Glock. In a related case, because of the instant conviction, the district court entered a final order revoking Mr. Contreras' supervised release and imposing a term of imprisonment for that prior offense.[1] This consolidated appeal followed.

## II.

We "review preserved challenges to the constitutionality of a criminal statute de novo." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2024) (citing *United States v. Clark*, 582 F.3d 607, 612 (5th Cir. 2009)); *accord*

---

[1] 23-50845

3

*Garner v. U.S. Dep't of Lab.*, 221 F.3d 822, 825 (5th Cir. 2000). We also "review[] *de novo* the district court's denial of a motion to dismiss an indictment." *United States v. Kay*, 513 F.3d 432, 440 (5th Cir. 2007).

## III.

The Second Amendment mandates that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. 18 U.S.C. § 922(g)(1) places a limit on the Second Amendment right to bear arms. Contreras argues it does so unconstitutionally, both facially and as applied to him.

We address a few preliminary points that precedent has already settled before turning to the heart of this case: Contreras' as-applied challenge to 18 U.S.C. § 922(g)(1).

## A.

The Government contends that this court's precedent that predated *Bruen* forecloses a constitutional challenge to 18 U.S.C. § 922(g)(1). That is not so.

As we have recently explained, "[u]nder the rule of orderliness, a later panel may overturn another panel's decisions when it has 'fallen unequivocally out of step with some intervening change in the law.'" *United States v. Diaz*, 116 F.4th 458, 465 (5th Cir. 2024) (quoting *In re Bonvillian Marine Servs., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021)). As *Bruen* "established a new historical paradigm for analyzing Second Amendment claims," we concluded it "constitutes such a change," mandating that we "abandon that prior precedent." *Id.* As follows, we are not bound by our pre-*Bruen* precedent prohibiting challenges to § 922(g)(1).

B.

Next, the Government contends that the Second Amendment's plain text does not extend to convicted felons. We disagree.

In *Diaz*, we concluded that the Second Amendment extends to convicted felons because they are part of "the people" it protects. 116 F.4th at 466 (citing *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (BARRETT, J., dissenting)); *see United States v. Williams*, 113 F.4th 637, 649–50 (6th Cir. 2024) ("After all, nothing in the Second Amendment's text draws a distinction among the political community between felons and non-felons— or, for that matter, any distinction at all.").

C.

Having addressed the Government's preliminary defenses, we turn to Contreras' first challenge: that § 922(g)(1) is facially unconstitutional.

A facial challenge to a legislative act is the "most difficult challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745 (1987). A facial challenge fails if the law is constitutional in *any set of circumstances*. *Id.* As the *Diaz* panel found at least one constitutional application of 922(g)(1), *see Diaz*, 116 F.4th at 471, Contreras' facial challenge is foreclosed.

D.

We now turn to Diaz's as-applied challenge. "The plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Id.* at 467. "The burden thus shifts to the government to demonstrate that regulating Diaz's possession of a firearm is 'consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24).

The *Bruen* Court instructed that "whether modern and historical regulations impose a comparable burden on the right of armed self-defense

and whether that burden is comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Bruen*, 597 U.S. at 29 (emphasis in original) (quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 767 (2010)). This "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 30 (emphasis in original).

Eschewing "an exhaustive survey of the features that render regulations relevantly similar," *Id.* at 111 (BREYER, J., dissenting), the Court stated that "*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. Thus, "[i]n assessing similarity, we consider 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.'" *Diaz*, 116 F.4th at 467 (quoting *Bruen*, 597 U.S. at 29).

"For the purposes of assessing [Contreras'] predicate offenses under § 922(g)(1), we may consider prior convictions that are 'punishable by imprisonment for a term exceeding one year.'" *Diaz*, 116 F.4th at 467 (quoting § 922(g)(1)). Contreras' criminal history includes three offenses, but the only pertinent offense is a user in possession of a firearm charge; as a felony conviction it is the predicate offense underlying the § 922(g)(1) conviction.[2]

The underlying conduct of the user in possession of a firearm conviction is as follows: An officer performed a traffic stop on Contreras' car,

---

[2] The other two offenses were possession of less than two ounces of marijuana, which are misdemeanor offenses and not relevant here as they are not predicate offenses.

smelled marijuana, and searched the vehicle, finding 33 grams of marijuana and pictures in his phone of Contreras possessing firearms and marijuana. After arresting Contreras, officers searched his home and found a 9-millimeter Glock and several magazines of ammunition. As punishment, the District Court for the Western District of Texas sentenced him to 21 months' confinement and a three-year term of supervised release. Mr. Contreras committed the offense at issue during that term of supervision.

The Government argues that permanent disarmament imposes a far lesser burden than capital punishment and estate forfeiture, commonly authorized punishments for felons in the American colonies and states shortly after the Founding. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 904–05 (3d Cir. 2020)); *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring) (capital punishment); *Bucklew v. Precythe*, 587 U.S. 119, 129 (2019) (same); *Tennessee v. Garner*, 471 U.S. 1, 13 (1985) (same)); *see also* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Calif. L. Rev. 277, 332 nn. 275 & 276 (2014) (collecting estate forfeiture statutes); *United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (collecting statutes and scholarship showing commonality of estate forfeiture), *vacated by United States v. Jackson*, No. 22-2870, 2024 WL 3768055 (8th Cir. Aug. 8, 2024).

True, capital punishment and a lifetime possession ban impose a comparable burden on the right of armed self-defense. Obviously, if one is dead, they can no longer possess a firearm. Similarly, a permanent ban on the use of firearms—what § 922(g)(1) imposes—makes it so someone can never again possess a firearm.

But that inquiry is not sufficiently particular. "At the time of our Nation's birth, 'felony' was 'a term of loose signification.'" *Diaz*, 116 F.4th at 468 (quoting The Federalist No. 42, at 228 (James Madison)). And while "virtually all felonies were punishable by death" at the Founding,

*Tennessee v. Garner*, 471 U.S. 1, 13 (1985), "the category was 'a good deal narrower' then." *Diaz*, 116 F.4th at 468 (quoting *Lange v. California*, 594 U.S. 295, 311 (2021)). "Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies." *Id.* (quoting *Garner*, 471 U.S. at 14). Relevant here, what § 922(g)(1) penalizes—possessing a firearm as a felon—"was not considered a crime until 1938 at the earliest." *Id.* And Congress did not pass § 922(g)(1)'s precursor to penalize the conduct of the underlying conviction—being a user in possession of a firearm—until 1968. *See* Gun Control Act, Pub. L. No. 90-618 (1968). "Simply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny." *Diaz*, 116 F.4th at 469. To meet its burden, then, the Government's evidence must be "more specifically targeted." *Id.* at 468.

In *Diaz*, the Government was able to point to colonial-era laws targeting theft and punishing it as a felony, including "horse theft—likely the closest colonial-era analogue to vehicle theft," which was often punished via death. *Id.* We concluded these laws sufficiently corresponded to the predicate offense and established a historical tradition of severely punishing similarly situated individuals. *Id.* at 468–69.

Here, the Government points to several other felonies that our Nation has a history and tradition of punishing by death and estate forfeiture. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790) (capital punishment for treason, murder, forging or counterfeiting a public security, piracy on the high seas); *United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023) (deceit and wrongful taking of property), *vacated by United States v. Jackson*, No. 22-2870, 2024 WL 3768055 (8th Cir. Aug. 8, 2024); Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Calif. L. Rev. 277, 332, nn.275 & 276 (2014) (estate forfeiture for counterfeiting government seal, embezzlement of wills or records, rioting, and theft); 2 Laws of the State of New York Passed at the Sessions of the

Legislature (1785-1788) at 664–65 (1886) (estate forfeiture for burglary, robbery, arson, malicious maiming and wounding, and counterfeiting); 2 Statutes at Large of Pennsylvania from 1682 to 1801 at 12 (1896) (estate forfeiture for rape and for setting a man's house, warehouse, outhouse, barn, or stable on fire)). The Government contends these "burdens were comparably justified by the need to adequately punish felons, deter reoffending, and protect society form those proven untrustworthy to follow the law."

The Government's argument is too broad. It is premised on the notion that all felonies are created equal. But the *Bruen* inquiry, as articulated in *Diaz*, requires not only showing that someone convicted of any felony was punished in a comparable way but that someone convicted of an analogous felony was punished in a comparable way. *Diaz*, 116 F.4th at 467 ("[T]he government must demonstrate that the Nation has a longstanding tradition of disarming someone with a criminal history *analogous to this*." (emphasis supplied)); *see also Williams*, 113 F.4th at 658–59 (classifying criminal offenses into different classes).

None of the specific felonies the Government points to are analogous to the facts here, namely "an unlawful user of a controlled substance" "knowingly possess[ing] a firearm." 18 U.S.C. § 922(g)(3). Standing alone, these historical laws are not enough.

That said, we have addressed a post-*Rahimi* facial challenge to 18 U.S.C. § 922(g)(3). *See United States v. Connelly*, 117 F.4th 269 (5th Cir. 2024). In *Connelly*, we concluded that "our history and tradition of firearms regulation show that there are indeed some sets of circumstances where § 922(g)(3) would be valid, *such as banning presently intoxicated persons from carrying weapons.*" *Id.* at 282 (emphasis supplied); *see also id.* at 280

9

No. 23-50840
c/w No. 23-50845

(discussing founding-era and post-reconstruction laws that banned people under the influence of alcohol).

While the Founding generation had no occasion to consider the relationship between firearms and intoxication via cannabis, it was familiar with intoxication via alcohol that was copiously consumed much like we are currently familiar with a proliferation of people ingesting marijuana. *See* David F. Musto, *The American Experience with Stimulants and Opiates*, 2 PERSPS. ON CRIME & JUST. 51, 51 (1998) ("[M]ost [non-alcoholic] drugs were not familiar products early in the 19th century . . . ."); *see also* Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985–87, 1010–11 (1970) (describing how American society gradually realized the social effects of narcotics in the late 1800s and began regulating them at the turn of the century); *id.* at 1011 ("[From 1914–31], we can find no evidence of public concern for, or understanding of, marijuana, even in those states that banned it . . . . Observers in the middle and late 1930's agreed that marijuana was . . . a very new phenomenon on the national scene.").

As follows, "intoxication via alcohol is the next-closest 'historical analogue' that we can look to." *Connelly*, 117 F.4th at 279. In *Diaz*, we implicitly concluded this "historical analogue" of regulating those intoxicated by alcohol, *Bruen*, 597 U.S. at 30, is "'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). Put differently, there is a tradition of regulating Contreras' predicate offense because he *was* intoxicated while he possessed the gun. This means "the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 681 (citing *Bruen*, 597 U.S. at 26–31).

10

Moreover, "[l]imitations on the constitutional right to bear arms while on probation are supported by our nation's historical tradition of firearm forfeiture laws, which temporarily disarmed persons while they completed their sentences." *United States v. Goins*, 118 F.4th 794, 805 (6th Cir. 2024) (Bush, J., concurring in part) (citing *United States v. Moore*, 111 F.4th 266 (3d Cir. 2024)); *accord Moore*, 11 F.4th at 271 ("The bottom line is this: during the founding era, forfeiture laws temporarily disarmed citizens who had committed a wide range of crimes. Convicts could be required to forfeit their weapons and were prevented from reacquiring arms until they had finished serving their sentences."); *Moore*, 111 F.4th at 269–71 (recounting Founding-era laws disarming convicts); *United States v. Winding*, 817 F.3d 910, 916 (5th Cir. 2016) ("[P]robationers do not enjoy the absolute liberty to which every citizen is entitled."). "This historical practice of disarming a convict during his sentence . . . is like temporarily disarming a convict on supervised release. After all, '[t]he defendant receives a term of supervised release thanks to his initial offense, and . . . it constitutes a part of the final sentence for his crime.'" *Id.* (second and third alterations in original) (quoting *United States v. Haymond*, 588 U.S. 634, 648 (2019) (plurality)).

Taken together, we have a history and tradition of punishing felons quite harshly, including taking away their weapons while they complete their sentence, and a history and tradition of disarming those that are intoxicated. Here, we have Contreras, a felon who after being convicted for being armed while intoxicated and being placed on temporary supervised release, was again found armed while intoxicated, this time while completing the sentence for the first crime.

There is no "historical twin" of § 922(g)(1); but that is not what our jurisprudence requires. *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 30). After all, "the Second Amendment permits more than just those

regulations identical to ones that could be found in 1791." *Id.* at 680. Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 692.

We conclude that § 922(g)(1) is consistent with these principles. There are historical regulations that have the same "how" and "why" as § 922(g)(1)'s application as to Contreras. Historically, we have disarmed felons for several reasons. Section 922(g)(1) shares the "how" (disarmament) and "why" (deter criminal conduct, protect the public, and facilitate rehabilitation) of these historical regulations and extends that tradition to individuals like Contreras. True, § 922(g)(1) imposes a tougher "how," permanent disarmament, than colonial-era laws temporarily disarming intoxicated individuals. But the "why" here is also heightened: Congress is not simply regulating someone who is currently using alcohol; instead, it is regulating *repeat users* of *controlled substances*.

Again, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 597 U.S. at 30 (emphasis in original). That is the case here. As applied to Contreras, § 922(g)(1) is "consistent with," *Bruen*, 597 U.S. at 24, and "'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). It also applies "faithfully the balance struck by the founding generation to modern circumstances." *Bruen*, 597 U.S. at 29 n.7.

Accordingly, Contreras' Second Amendment claim fails, and we AFFIRM his conviction.