# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
January 23, 2025
Lyle W. Cayce
Clerk

No. 24-60047

United States of America,

*Plaintiff—Appellee*,

*versus*

Damion Xavier Giglio,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 1:23-CR-39-1

Before Elrod, *Chief Judge*, and Dennis and Higginson, *Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

While still on supervised release for a previous felony, Appellant Damion Giglio was arrested for, and ultimately convicted of, violating 18 U.S.C. § 922(g)(1), the felon-in-possession statute. He raises two points on appeal: that § 922(g)(1) is unconstitutional as applied to him, and in the alternative, that he is entitled to a less severe sentence because the district court erred in calculating the applicable sentencing-guideline range. We disagree. Because our history demonstrates a tradition of disarming individuals serving criminal sentences, the government could regulate Giglio's firearm use without offending the Second Amendment. And

No. 24-60047

because the district court would have entered the same sentence even if Giglio's discretionary-guideline-based argument is correct, he can, at most, only show harmless error.  Accordingly, we AFFIRM the district court on both grounds.

I

A

In early 2018, Giglio was twice arrested for crimes associated with gun violence.  During the first incident, Giglio allegedly shot at an individual following a confrontation at the local Dollar General.  When the individual attempted to leave, Giglio reportedly fired three shots at his vehicle.  Giglio was arrested for aggravated assault with a deadly weapon, but he was released when he posted bond.

Less than a month later, law enforcement officers responded to another report of Giglio's violence.  He had apparently assaulted an individual with a metal pipe, and following some escalation, Giglio retrieved a rifle from his truck.  There is some debate as to whether Giglio attempted to shoot one of the individuals present or if he simply fired into the ground in that direction, but Giglio nevertheless admitted to having fired the rifle.

Giglio was once again arrested for aggravated assault.  When he was taken into custody, he described himself as a methamphetamine and marijuana user and admitted that he would likely test positive for the former.

A Southern District of Mississippi grand jury indicted Giglio on four counts of possessing a firearm while being an unlawful user of a controlled substance in violation of 18 U.S.C. § 922(g)(3).  Giglio pleaded guilty to one of those counts, and the district court sentenced Giglio to 41 months' imprisonment followed by three years of supervised release on August 5, 2019.

B

Giglio was released from prison and began his three-year term of supervised release on January 25, 2021. As a condition of his supervised release, Giglio was prohibited from owning, possessing, or accessing firearms or ammunition.

Apparently undeterred, Giglio decided to go hunting with an Anderson AM-15 rifle just over two years later. A Mississippi Department of Marine Resources (MDMR) officer, who happened to lease the property on which Giglio was hunting, spotted Giglio on his game cameras. A national-crime-database search revealed that Giglio was a convicted felon who was still on supervised release, so the MDMR arrested him for possessing a firearm, trespassing, and violating various hunting regulations.

Five weeks later, another Southern District of Mississippi grand jury indicted Giglio for possessing a firearm in violation of 18 U.S.C. § 922(g)(1), the felon-in-possession statute. Giglio moved to dismiss the indictment, arguing that § 922(g)(1) is unconstitutional as applied to him. The district court disagreed. It denied Giglio's motion, and Giglio pleaded guilty.

Giglio's presentence investigation report assigned a total offense level of 12: a base offense level of 14 for violating § 922(g)(1), USSG § 2K2.1(a)(6)(A), and a 2-point reduction for acceptance of responsibility, USSG § 3E1.1(a). Giglio objected. Among other things, he argued that his base offense level should be reduced from 14 to 6 because he possessed his firearm for "lawful sporting purposes"—i.e., deer hunting during open season. See USSG § 2K2.1(b)(2).

After thoroughly entertaining Giglio's objection, the district court overruled it and adopted the presentence investigation report without change. It sentenced Giglio to 27 months' imprisonment. In doing so, the court noted that it "would have imposed the same identical sentence

pursuant to any variance or non-guideline sentence, which, of course, would be based upon [Giglio]'s conduct in this case, the statutory sentencing factors under [18 U.S.C. § 3553], any and all mitigating and aggravating circumstances in this case[,] as well as those circumstances that have already been enumerated by the Court during the sentencing hearing."

Giglio timely appealed.

## II

First, Giglio reasserts his argument that § 922(g)(1) is unconstitutional as applied to him. By raising this challenge in his motion to dismiss, Giglio preserved his right to pursue it again here. *United States v. Penn*, 969 F.3d 450, 459 (5th Cir. 2020); *see also Class v. United States*, 583 U.S. 174, 178–82 (2018). "We review preserved challenges to the constitutionality of a criminal statute *de novo*." *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014) (italics added).

## A

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "'[A]ll people have the right to keep and bear arms,' but 'history and tradition support Congress's power to strip certain groups of that right.'" *United States v. Diaz*, 116 F.4th 458, 466 (5th Cir. 2024) (alteration in original) (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)). To ascertain how far Congress may tread without offending the Second Amendment, we employ a two-step analysis. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022). We start, as always, with the text. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* And if that is the case, the burden "shifts to the government to demonstrate that regulating [the challenger's] possession of a firearm is 'consistent with the Nation's

historical tradition of firearm regulation.'" *Diaz*, 116 F.4th at 467 (quoting *Bruen*, 597 U.S. at 24).

To carry this burden, the government must "identify a well-established and representative historical analogue." *Bruen*, 597 U.S. at 30 (emphasis omitted). "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 29). "In assessing similarity, we consider 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified.'" *Diaz*, 116 F.4th at 467 (quoting *Bruen*, 597 U.S. at 30). Put differently, "[w]hy and how the regulation burdens the right are central to this inquiry." *Rahimi*, 602 U.S. at 692. "The challenged and historical laws . . . must both (1) address a comparable problem (the 'why') and (2) place a comparable burden on the right holder (the 'how')." *United States v. Daniels*, No. 22-60596, --- F.4th ---, slip op. at 6 (5th Cir. Jan. 6, 2025).

B

"The plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1) . . . ." *Diaz*, 116 F.4th at 467. Thus, we move to the second step of the analysis and consider whether the government's regulation of Giglio's right, given the facts of his case, is historically justified. We conclude that it is. Because the Constitution allows the government to disarm individuals who are carrying out criminal sentences, § 922(g)(1) is constitutional as applied to Giglio.

1

In discussing relevant historical analogues, the government points to the Third Circuit's thorough *United States v. Moore* decision. 111 F.4th 266 (3d Cir. 2024). Tasked, like us, with assessing the constitutionality of

No. 24-60047

§ 922(g)(1), our sister court faced the same question that we face today: "Does a convict completing his sentence on supervised release have a constitutional right to possess a firearm?" *Id.* at 267–68. To answer it, the court looked to founding-era forfeiture laws, which "temporarily disarmed citizens who had committed a wide range of crimes." *Id.* at 269–72. A 1790 Pennsylvania law, for example, permitted the state to "seize[] all of [certain convicts'] possessions, including his weapons, as part of his 'servitude' or sentence." *Id.* at 269.[1] And the same was true of Massachusetts,[2] Virginia,[3] and Kentucky[4] laws as well. *Id.* at 270–71. Those convicted under each "could be required to forfeit their weapons and were prevented from reacquiring arms until they had finished serving their sentences." *Id.* at 271.

That this "forfeiture of property and limitation on rights occurred while the convict was serving out his sentence, not only while he was

---

[1] *See* Act of Apr. 5, 1790, ch. 1516, § 1, 13 Statutes at Large of Pennsylvania, at 511, 511–12 (James T. Mitchell & Henry Flanders eds., 1908) ("[E]very person convicted of robbery, burglary, sodomy or buggery . . . shall forfeit to the commonwealth all . . . goods and chattels whereof he or she was . . . possessed at the time the crime was committed . . . and be sentenced to undergo a servitude of any term . . . not exceeding ten years . . . .").

[2] *See* Act of Oct. 28, 1786, 1 Laws of the Commonwealth of Massachusetts, at 346, 347 (J.T. Buckingham ed., 1807) (requiring forfeiture of "all . . . goods and chattels to th[e] Commonwealth" in conjunction with a six-to-twelve-month sentence for violating certain anti-riot laws); *see also Folajtar v. Att'y Gen.*, 980 F.3d 897, 914 (3d Cir. 2020) (Bibas, J., dissenting) (reporting that "after Shays's Rebellion, the Massachusetts legislature made rebels . . . swear allegiance and give up their arms for three years before they could be pardoned").

[3] *See* Act of May 5, 1777, ch. 5, § 4, 9 Virginia Statutes at Large, at 286, 287 (William Waller Hening ed., 1821) (obliging a counterfeiter to "forfeit his whole estate, real and personal" and "to serve on board some armed vessel . . . without wages").

[4] *See* Act of Dec. 19, 1801, § 33, Collection of All the Public and Permanent Acts of the General Assembly of Kentucky, at 360, 371 (Harry Toulmin ed., 1802) (punishing those who "come before the justices of any court . . . with force and arms" by making them "forfeit their arms to the commonwealth" and "fin[ing] and imprison[ing] [them] at the discretion of a jury").

physically in prison," provided sufficient support for the Third Circuit's ultimate conclusion. *Id.* at 272. Supervised release, of course, "constitutes a part of the final sentence for [a] crime." *Id.* at 271 (quoting *United States v. Haymond*, 588 U.S. 634, 648 (2019) (plurality op.)). So the "historical practice of disarming a convict during his sentence" justified the modern practice of disarming individuals "serving their sentences on supervised release." *Id.* at 271–72. And § 922(g)(1), then, was constitutional as applied to Moore. *Id.* at 273.

The government also cites the Sixth Circuit's well-reasoned opinion in *United States v. Goins*, 118 F.4th 794 (6th Cir. 2024). Like Moore and Giglio, Goins brought an as-applied challenge to § 922(g)(1), he was on probation at the time of his arrest,[5] and his underlying felonies involved the unlawful use of drugs. *Id.* at 796–97. In light of those facts, the court held the statute constitutional as applied to Goins for two main reasons. First, it identified a historical tradition of "temporarily disarming persons who had engaged in dangerous conduct." *Id.* at 798 (emphasis omitted). And second, it concluded that "our nation's historical tradition of forfeiture laws . . . supports disarming those on parole, probation, or supervised release." *Id.* at 801–02 (citing *Moore*, 111 F.4th at 269–72). It discussed the statutes identified in *Moore* and added examples from three other states. *See id.* at 802 (collecting statutes from Pennsylvania, Maryland, Massachusetts, North Carolina, Vermont, and Virginia). From these, the court concluded that "forfeiture of the estate, goods, or chattels upon conviction was common during the founding era." *Id.* And if that was the case then, the government

---

[5] *See Johnson v. Owens*, 612 F. App'x 707, 711 (5th Cir. 2015) (recognizing that probation "is comparable to supervised release in the federal system") (citing *Samson v. California*, 547 U.S. 843, 850, 854–55 (2006)); *see also United States v. Winding*, 817 F.3d 910, 916 (5th Cir. 2016).

today could justifiably "disarm[] those on parole, probation, or supervised release." *Id.* at 801–02.

We agree with our learned brethren and sistren: the government may disarm those who continue to serve sentences for felony convictions. *See also United States v. Contreras*, No. 23-50840, --- F.4th ---, slip op. at 11–12 (5th Cir. Jan. 13, 2025). The laws cited in *Moore* and *Goins* make clear that disarmament was a typical condition of all manner of sentences. They establish a historical tradition wherein "[c]onvicts could be required to forfeit their weapons and were prevented from reacquiring arms until they had finished serving their sentences." *Moore*, 111 F.4th at 271.

Importantly, this tradition is a match for both the "why" and the "how" of disarming felons who are still serving out sentences. *See Contreras*, No. 23-50840, slip op. at 12; *Rahimi*, 602 U.S. at 692. The Pennsylvania forfeiture law, for example, "burdened the right to bear arms for the same reasons that we now burden the rights of convicts on supervised release: to deter criminal conduct, protect the public, and facilitate the convict's rehabilitation." *Moore*, 111 F.4th at 269–70 (citing 18 U.S.C. § 3583(c) and Act of Apr. 5, 1790, 13 Statutes at Large of Pennsylvania, at 511); *accord Contreras*, No. 23-50840, slip op. at 12; *see also Diaz*, 116 F.4th at 469 ("The justification for § 922(g)(1) is . . . to deter violence and lawlessness."). And the law imposed that burden in a substantially similar manner. Though it (and the other laws cited) required forfeiture of *all* chattels, that practice can nevertheless justify the narrower practice of prohibiting possession of *some* (*viz.*, firearms). *See Diaz*, 116 F.4th at 469–70 (reasoning that that opinion's the-greater-includes-the-lesser argument was sufficient to justify its conclusion that disarmament was permissible); *cf. id.* at 469 ("[I]f capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible."); *Rahimi*, 602 U.S. at 699 ("[I]f imprisonment was permissible to respond to

the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that [§] 922(g)(8) imposes is also permissible.").

We recognize that not all § 922(g)(1) convictions fit squarely within this tradition. But Giglio's does. The lynchpin of our analysis is that Giglio, at the time of his conviction, was serving a sentence for a prior conviction. *See Goins*, 118 F.4th at 807 (Bush, J., concurring) (emphasizing that Goins's "conviction for illegal possession of a firearm may be upheld simply because Goins was on probation at the time of his offense"). And because we must factor in the particularities of an individual's circumstances when adjudicating as-applied challenges, we hold that the government has carried its burden in showing that it could deprive Giglio of firearms at the time of his § 922(g)(1) arrest.

2

Bolstering this conclusion is the unremarkable proposition that those subject to criminal sentences do not enjoy the full panoply of rights guaranteed by our Constitution. *See Goins*, 118 F.4th at 803–04; *id.* at 807 & n.1 (Bush, J., concurring). And while "custodial sentences are qualitatively more severe" than their noncustodial counterparts, the latter can nevertheless "substantially restrict the[] liberty" of the individuals subject to them. *Gall v. United States*, 552 U.S. 38, 48 (2007). It is "[i]nherent in the very nature of probation . . . that probationers do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001) (internal quotation marks omitted). And we have recognized that those on supervised release "enjoy even less of the average citizen's absolute liberty than do probationers." *See United States v. Winding*, 817 F.3d 910, 916 (5th Cir. 2016) (quoting *Samson v. California*, 547 U.S. 843, 850 (2006)).

No. 24-60047

Under this principle, courts routinely recognize the government's ability to deprive these individuals of rights in ways that "would likely be unconstitutional if applied outside the context of punishment." Kate Weisburd, *Rights Violations as Punishment*, 111 Calif. L. Rev. 1305, 1320 (2023); *see also Knights*, 534 U.S. at 119 ("Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens."). Probationers, for example, often face restrictions on their freedom to travel, their liberty of association, and their right to work where they choose. *See Gall*, 552 U.S. at 48. And it is well-settled that we employ a different Fourth Amendment analysis when evaluating the rights of those subject to ongoing punishment. *E.g.*, *Knights*, 534 U.S. at 121 (allowing a search of a probationer's house based on reasonable suspicion); *see also* Weisburd, *supra*, at 1323 (reporting that a large proportion of non-carceral punishment programs employ suspicionless searches of individuals' homes).

Taken together, all of this indicates that the government may more readily deprive an individual of his constitutional rights when he is subject to an ongoing criminal sentence. And we do not see any reason why the Second Amendment ought to be treated any differently. Early American history reveals that individuals could be disarmed while carrying out such sentences, and modern practice comports with that principle in the gun-rights context and otherwise. Accordingly, we conclude that the government was justified in depriving Giglio of his Second Amendment rights at the time of his arrest, and we uphold the constitutionality of § 922(g)(1) as applied to him.

C

Giglio rejoins that "[s]upervised release status is irrelevant to an as-applied Second Amendment challenge to § 922(g)(1)." Citing *Diaz*, he

10

maintains that we can "consider *only* 'convictions that are "punishable by imprisonment for a term exceeding one year."'" He also notes that, in *Diaz*, we disregarded "misconduct occurring at the same time as the charged gun possession" "because 'that charge must . . . rely on previous history.'"

Even assuming *arguendo* that this is a correct reading of *Diaz*, our decision today does not contravene it. As we have stressed, our holding turns on the fact that Giglio was still on supervised release at the time of his arrest. To know that, we need not look to any dismissed charges, convictions for crimes not punishable for more than a year, or convictions stemming from the same indictment, which are the pieces of information proscribed by *Diaz*. 116 F.4th at 467. Instead, we learn all we need from precisely the same evidence: the individual's prior felony conviction. Giglio's § 922(g)(3) conviction included a punishment for (what ended up being) seventeen months of imprisonment and just over two years of supervised release. We need not look beyond that conviction to understand that it was constitutional for the government to regulate his possession of firearms for that period of time.

### III

Next, Giglio reasserts that his base offense level was miscalculated. As below, he maintains that he is entitled to the lawful-sporting-purposes offense level pursuant to USSG § 2K2.1(b)(2). Giglio ignores, however, that the district court specifically stated that even if it "made an error in the calculation of any of these sentencing guidelines," it "would have imposed the same identical sentence pursuant to any variance or non-guideline sentence, which, of course, would be based upon [Giglio]'s conduct in this case, the statutory sentencing factors under [18 U.S.C. § 3553], [and] any and all mitigating and aggravating circumstances in this case." So even if Giglio is correct that he is entitled to a different guideline calculation, he can do no

better than show harmless error.[6] *United States v. Guzman-Rendon*, 864 F.3d 409, 411 (5th Cir. 2017).

Even if a district court employs an incorrect guideline range, there are two ways to show harmless error. *Id.* One of those ways is "to show that the district court considered both ranges (the one now found incorrect and the one now deemed correct) and explained that it would give the same sentence either way." *Id.* (quoting *United States v. Ibarra-Luna*, 628 F.3d 712, 714 (5th Cir. 2010)).[7] Indeed, "[w]e have repeatedly held that, when a district court entertains arguments as to the proper guidelines range and explicitly states that it would have given the same sentence it did regardless, any error in the range calculation is harmless." *United States v. Nanda*, 867 F.3d 522, 531 (5th Cir. 2017). To be clear, this is not a magic-words requirement. *United States v. Greer*, 20 F.4th 1071, 1076 (5th Cir. 2021). A court's mere recitation that it would impose the same sentence is neither necessary nor sufficient. *See United States v. Vega-Garcia*, 893 F.3d 326, 328 (5th Cir. 2018) (unnecessary); *United States v. Tanksley*, 848 F.3d 347, 353 (5th Cir. 2017) (insufficient). Instead, for an error to be harmless under this first option, the

---

[6] Although the government did not make this argument before us, we can consider whether error was harmless *sua sponte*. *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010).

[7] Under the other method, the "proponent of the sentence [must] convincingly demonstrate[] both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." *Ibarra-Luna*, 628 F.3d at 714. "This is a heavy burden," *id.* at 717, and this test "applies even if the correct guidelines range was not considered," *Guzman-Rendon*, 864 F.3d at 411. But because Giglio's preferred range *was* considered, and because we find that the other harmless-error test is satisfied, we do not consider whether this second one would be also. *See United States v. Rico-Mejia*, 859 F.3d 318, 323 (5th Cir. 2017) (applying *Ibarra-Luna* only because "the district court d[id] not consider the correct guidelines range"), *overruled on other grounds by United States v. Castleman*, 572 U.S. 157, 162–68 (2014).

district court must actually "entertain[] arguments as to the [purportedly] proper guidelines range." *Nanda*, 867 F.3d at 531.

That is exactly what happened here. At sentencing, the district court (1) acknowledged Giglio's objection to the PSR's calculation, (2) heard argument regarding that objection, (3) received testimony from several witnesses to help it decide whether the proposed guideline range applied, (4) requested and considered additional briefing on the issue, (5) heard argument again, and (6) provided extensive justification for its conclusion that Giglio was not entitled to the § 2K2.1(b)(2) offense level. So even if we were to decide that the range Giglio advocated for was the proper one, we have no doubt that the court considered it. *See United States v. Kinzy*, No. 22-30169, 2023 WL 4763336, at *9–10 (5th Cir. Aug. 24, 2023) (applying *Guzman-Rendon* and *Nanda*). This, taken together with the fact that the district court explicitly stated that it would have imposed "the same identical sentence" notwithstanding any calculation error, is sufficient to demonstrate that Giglio's argument is unavailing. Even if we were to decide that the district court erred in declining to apply the § 2K2.1(b)(2) offense level to Giglio, that error would be harmless. *See Guzman-Rendon*, 864 F.3d at 412. Giglio's sentence would have been the same either way, so our precedent allows us to uphold it without reaching the merits of Giglio's argument.

IV

Given our historical tradition of disarming individuals subject to ongoing criminal punishment, the government could justifiably regulate Giglio's possession of a firearm while he remained on supervised release. Accordingly, § 922(g)(1) is constitutional as applied to Giglio, and we AFFIRM his conviction thereunder. And because the district court would have entered the same sentence even if Giglio were entitled to a different

No. 24-60047

guideline calculation, Giglio's objection raises no more than harmless error, and we AFFIRM the imposition of that sentence.